557 S.E.2d 693

**Dale P. WIDMAN, Respondent/Appellant,**

v.

**Richard T. WIDMAN, Appellant/Respondent.**

**No. 3416.**

Court of Appeals of South Carolina.

Heard Oct. 4, 2001.

Decided Dec. 10, 2001.

Rehearing Denied Jan. 17, 2002.

Certiorari Denied May 16, 2002.

---

102

104

Robert N. Rosen, of Rosen, Goodstein & Hagood, of Charleston, for appellant/respondent.

Margaret D. Fabri, of Charleston, for respondent/appellant.

HUFF, Judge.

This is a cross appeal in a divorce action. The issues on appeal concern identification and valuation of marital property, equitable apportionment, child support, and contempt. We affirm in part, reverse in part and remand.

## FACTUAL/PROCEDURAL BACKGROUND

Richard T. Widman (Husband) and Dale Poulnot Widman (Wife) were married in 1981 on Valentine's Day. When they married, Husband was thirty-two years old and Wife was twenty-five years old. Husband earned a Masters of Business Administration in hotel and restaurant management at Michigan State University and worked as the General Manager of the Mills House Hotel in Charleston, South Carolina. Wife graduated magna cum laude from Duke University and worked in her family's business, Kerrison's Department Store.

Husband, who worked for Holiday Inn in a management position, received a job transfer to Detroit, Michigan, and after they were married, Wife joined Husband in Detroit. Wife's father subsequently requested that Wife come back to the family business. The parties agreed, and Wife moved back to Charleston in August of 1981. Husband continued to work for Holiday Inn, and the parties commuted for a period of time, until Husband quit his job and moved back to Charleston in the summer of 1982. After his return, Husband joined a venture to build King's Courtyard Inn in downtown Charleston. The inn was opened in November 1983 and was managed by Husband. During the early years, Husband earned money through some consulting work and drew a minimal salary for managing the inn. Thus, toward the beginning of the marriage, Wife generally earned greater income than Husband. This changed drastically, however, after Husband's venture in King's Courtyard Inn and several subsequent hotel inns began to reap substantial profits.

During the marriage, the parties accumulated a $6,720,000.00 marital estate consisting of numerous inns and related businesses worth more than $5,000,000.00, two marital homes with equity of more than $900,000.00, as well as various stocks, bonds, life insurance, and pension plans. Additionally, Husband's annual income grew to approximately $450,000.00 while Wife's annual income remained around $40,000.00. During the development years of the inns, Husband used earned income of the parties and distributions from ownership of the inns to reinvest into the businesses in order to promote their growth and viability. The inns are set up as limited partnerships with Husband as the general partner, which gives Husband the discretion of when to make a distribution from revenues and the amount of each distribution. Husband maintained control of the businesses' cash flow and the parties' income. Even after the inns were established and producing significant income, Husband continued to use his income and distributions to support the business. Money flowed freely between the business and personal accounts of the parties. Loans were made to the businesses from the parties' joint personal checking account; partnership shares were purchased out of the parties' joint personal checking account; and money was borrowed from the businesses to keep the family finances afloat. In addition, the personal and business accounts of the parties were used interchangeably by the parties.

Wife had no day-to-day responsibilities for the inns; however, she hosted several openings of new inns and entertained Husband's business associates. At Husband's insistence, Wife traveled with him out of the country, at the expense of her own professional responsibilities to Kerrison's. Wife also participated in the designing and writing of marketing brochures for the inns, and worked on a project for the Rutledge House Inn. Husband continually assured Wife that "the inns were their retirement."

Husband's parents made significant investments in the inns and advanced $75,000.00 to the parties for development of one of the businesses. However, these were arm's length transactions. Husband's parents appear to have profited from the investments, and they obtained a note and mortgage on the parties' beach home as collateral for the $75,000.00 loan. At

the time of trial, the parties were still obligated to make monthly payments to repay this loan. Additionally, Husband's parents made generous monetary gifts over the years to Husband, Wife and the parties' children. Husband's father testified as to the various monetary gifts made to the parties over the years, and stated that many of the gifts were intended to help Husband in his business ventures. Husband's father testified, however, that all of the gifts were joint gifts to Husband and Wife. The gifted monies were not kept separate and apart from marital funds. The check registers of various accounts show that money was used from any and all sources to support the cash flow of the businesses. Moreover, Husband's parents never asserted prior to litigation that the gifted monies were for anything other than the benefit of both parties and the support of the marriage.

During the marriage, Husband inherited $192,000.00 from his aunt's estate. Husband testified he used some of these funds to purchase two shares of stock in the inn businesses. One share of stock was purchased from Ronald Hutcherson in the John Rutledge House. The other share was purchased from the Gary Olin Trust in the King's Courtyard Inn. Wife also owned nonmarital property which included 26 shares of Kerrison's stock, valued at $100,000.00, a 1/3rd interest in the carriage house located behind her parent's home in downtown Charleston, and a 1/9th interest in an unimproved lot on Sullivan's Island.

Husband and Wife have three daughters, all three of whom were minors at the time of trial. Husband also has an adult daughter from a prior marriage. The parties employed a housekeeper/nanny to assist with the children and housework, but both parties contributed substantially to the needs of the children in the home. All three girls attend a private school, Ashley Hall School, where Wife is currently employed as the Director of Development. The tuition for all three girls is $2,050.00 per month. The children also attend summer camps in North Carolina every year, which cost between $1,815.00 and $2,810.00 per child each summer.

Husband instituted this action in November 1997, after Wife's investigator confirmed Husband's adulterous affair with Linn Lesesne, the Director of Sales and Marketing for the

management company formed by Husband to manage all the inns. Wife first became suspicious of the affair in October 1996 and confronted Husband on several occasions, but Husband continued to deny the relationship. Husband and Wife separated in April 1997, but began going to marriage counseling in an effort to save their marriage. However, Husband continued his affair with Linn Lesesne. Upon receiving the report from the investigator in August of 1997, Wife waited until Husband returned from a trip to confront him with the report. Husband continued to deny the affair until a couple of weeks later. The marriage counselor testified that he believed Wife had been emotionally abused by Husband during the marriage and that Wife was more active in attempting to save the marriage.

Husband filed this action seeking, inter alia, joint custody of the parties' three minor children, or in the alternative extensive visitation, a determination of reasonable child support, and equitable division of the marital property. Husband also sought a temporary order restraining Wife from harassing him or interfering with his right to a peaceful existence, as well as from using vulgar, profane language or making disparaging remarks about him in the presence of his children.

Wife answered and counter-claimed seeking, among other things, a divorce on the ground of adultery, custody, child support, alimony, equitable apportionment of marital property, and an order restraining Husband from exposing their children to his extramarital relationship and from selling or encumbering marital property. Wife also sought attorneys' fees and costs for litigation of the divorce.

By temporary order dated June 23, 1998, the court awarded Wife temporary custody of the children, $15,000.00 monthly in temporary total support, and $25,000.00 for attorney and expert fees. The court also awarded visitation for Husband as agreed to between the parties and required Husband to keep the minor children out of the presence or proximity of his paramour pending the divorce and to attend and complete a session of the "Consider the Children" program.

Each side filed motions to hold the other in contempt for failure to comply with the court's orders compelling discovery and for violating orders of protection. The parties agreed to

have these issues addressed at the final hearing. Additionally, the parties agreed to bifurcate the issue of attorneys' fees and costs.

The final hearing began on February 16, 1999 and concluded on February 19, 1999. By final order dated March 19, 1999, the trial judge granted Wife a divorce on the ground of adultery. Wife was also awarded one-half of the marital estate, which the court valued at $6,720,000.00, custody of the minor children, and child support in the amount of $3,500.00 per month. Wife did not receive an alimony award. However, Husband was ordered to execute a note and mortgage payable to Wife covering the majority of Wife's share of the marital estate, totaling $2,451,042. The court further ordered Husband to pay the note and mortgage over a 240–month period at 6% interest. To satisfy the remainder of Wife's share of the marital estate, Husband was ordered to immediately transfer certain property in his possession to Wife.

In the final divorce decree, the court included judgment on the outstanding rules to show cause and motions for contempt. In its decree, the trial court found Wife to be in willful violation of the court's order for (1) failing to file proper financial declarations as previously ordered, (2) disclosing information to Husband's parents and adult daughter regarding Husband's prior adulterous conduct, and (3) intentionally withholding the existence of a trust which was the subject of a motion to compel. Consequently, the trial judge sentenced Wife to 30 days in jail on each of the first two violations, but suspended that sentence upon "strict compliance with the terms of this order" and that Wife refrain from further denigration of Husband or damage to his reputation, and from further use of discovery information except for purposes of enforcing the court's order. The court further required Wife to pay "attorneys' fees and costs for the prosecution of these Rules to Show Cause." For the failure to disclose the existence of a trust, the court ordered Wife to reimburse Husband "for the cost of compelling the disclosure of same."

Following Husband's motion to alter or amend, the trial court issued an order on November 3, 1999, modifying the final order. In this supplemental order, the court corrected certain mathematical errors and clarified that the interest paid

on the note should be designated as lump-sum alimony for taxation purposes. The order further provided as follows:

By agreement of the parties, the court was authorized to approve the language of the Note and Mortgage to be executed by [Husband] in favor of [Wife] to secure [Wife's] equitable apportionment of marital assets. The Final Decree and Order provided for the Note and Mortgage and instructed that the parties agree upon the appropriate language. Due to the complexity of the Note and Mortgage and upon reconsideration, the court finds it appropriate that the attorneys for [Husband] and [Wife] agree upon an independent attorney practiced and well versed in real estate and business transactions to prepare the terms of the Note and Mortgage being guided by this Court's order. Should the attorneys not agree on an individual attorney, each attorney is to submit the name of two attorneys from which the Court shall select the individual to prepare the terms of the Note and Mortgage.... In addition to the language in the Order and other normal language of a commercial Note and Mortgage, there should be included a due on sale clause, an acceleration clause, a refinance clause, [and] language indicating that a default in first Mortgage would result in default of second Mortgage. The acceleration, due on sale and default clauses need to be established on a pro rata basis. There shall also be provisions for the substitution of collateral to allow [Husband] to refinance the mortgaged property in a commercially reasonable manner which does not affect the interest of [Wife]. The Family Court retains jurisdiction to grant relief to either party in the interpretation of and practical application of the Note and Mortgage.

To date the note and mortgage have not been signed because the terms are in dispute. Husband filed a notice of appeal and Wife has cross-appealed.

### STANDARD OF REVIEW

When reviewing an appeal from the family court, this court has the authority to find the facts in accordance with its own view of the preponderance of the evidence. *Rutherford v. Rutherford,* 307 S.C. 199, 204, 414 S.E.2d 157, 160 (1992). We are not, however, required to disregard the findings of the

trial judge, who saw and heard the witnesses and was in a better position to evaluate their credibility and assign comparative weight to their testimony. *Wilson v. Walker,* 340 S.C. 531, 537, 532 S.E.2d 19, 22 (Ct.App.2000); *Mazzone v. Miles,* 341 S.C. 203, 207, 532 S.E.2d 890, 892 (Ct.App.2000).

## *LAW/ANALYSIS*

I. Husband's Appeal

A. Equitable Apportionment

1. Division of Marital Estate

Husband first argues that the trial judge abused his discretion in awarding one-half of the marital estate to Wife, because he failed to give any weight to the financial contributions of Husband's family and gave too much weight to Husband's fault in the break-up of the marriage. He asserts the trial judge used the equitable division award to punish Husband, and the judge failed to acknowledge his family's contributions to the marital estate. We disagree.

 The apportionment of marital property is within the discretion of the family court judge and will not be disturbed on appeal absent an abuse of discretion. *Morris v. Morris,* 295 S.C. 37, 39, 367 S.E.2d 24, 25 (1988); *Bungener v. Bungener,* 291 S.C. 247, 251, 353 S.E.2d 147, 150 (Ct.App.1987). South Carolina Code Ann. § 20–7–472 (Supp.2000) enumerates fifteen factors applicable to a determination of equitable distribution. These factors are as follows: (1) duration of the marriage, (2) marital misconduct or fault and its effect on the break-up of the marriage, (3) the value of the marital property and the contribution of each spouse to the acquisition or appreciation in value of the marital property, including the contribution of the spouse as homemaker, (4) the income and earning potential of each spouse and opportunity for future acquisition of assets, (5) the health, both physical and emotional, of each spouse, (6) need of either spouse for additional training or education, (7) the nonmarital property of each spouse, (8) the existence or nonexistence of vested retirement benefits for each spouse, (9) whether alimony has been awarded, (10) desirability of awarding the family home, (11) the tax consequence to each spouse as a result of the apportionment,

(12) the existence and extent of any support obligations of either party, (13) liens and encumbrances on marital and separate property and other existing debts, (14) child custody arrangements and obligations, and (15) any other relevant factors as the trial court shall expressly enumerate in its order. The statute vests in the family court the discretion to decide what weight should be assigned to the various factors. On review, this court looks to the fairness of the overall apportionment, and if the end result is equitable, the fact that this court might have weighed specific factors differently than the family court is irrelevant. *Johnson v. Johnson,* 296 S.C. 289, 300–01, 372 S.E.2d 107, 113 (Ct.App.1988); *see also Ball v. Ball,* 314 S.C. 445, 448, 445 S.E.2d 449, 451 (1994) (the family court has wide discretion in determining the contributions made by each spouse to the marital estate; the weight to be accorded evidence of marital misconduct is for the court to determine in the exercise of its discretion); *Doe v. Doe,* 324 S.C. 492, 502, 478 S.E.2d 854, 859 (Ct.App.1996) (the reviewing court will affirm the family court judge's apportionment of marital property if it can be determined that the judge addressed factors under statute governing apportionment with sufficiency for the reviewing court to conclude that judge was cognizant of statutory factors).

Here, the family court set forth several facts relevant to its equitable division of the marital estate. The court considered, among other things (1) the length of this 18–year marriage, (2) the Husband's adulterous affair and its contribution to the break-up of the marriage as well as its effect on the economic circumstances of the parties, (3)˙ the value of the marital property and the direct and indirect contributions of both parties to the marital estate, (4) the disparity of income and earning potential of Wife, (5) the devastating effect of the break-up of the marriage on Wife, (6) the nonmarital property of each party, (7) the nonexistence of vested retirement benefits, and (8) tax ramifications in allowing Husband to designate the interest paid on the note and mortgage to Wife as alimony for tax purposes only. Further, we note the court expressly recognized the generosity of the Husband's parents to the parties over the years.

Our review of the record convinces us the family court addressed factors under the statute governing apportionment

with sufficiency to indicate the court was cognizant of those factors. Furthermore, in considering the overall fairness of the apportionment we find the end result to be equitable. Accordingly, we are not persuaded Husband has established an abuse of discretion by the family court in its apportionment of the marital estate. Finally, giving due deference to the court's authority to assign such weight to the relevant factors as it deems appropriate, we will not second-guess the trial court's consideration of Husband's marital misconduct, its impact on the dissolution of the marriage, and the subsequent economic effect on the parties. Therefore, we affirm the trial court's apportionment of the marital estate.

## 2. Execution of Mortgage

Next, Husband argues the trial court abused its discretion in requiring him to execute a mortgage "which had the effect of making Wife a co-owner of his business, [preventing] Husband from operating his business and [possibly forcing] him into bankruptcy." He does not take issue with the trial court's authority to order the execution of the mortgage, but asserts rather that the method of division of the property, i.e., the inclusion of the mortgage, was not reasonable.[1] We disagree.

The trial court has wide discretion in determining how to distribute marital property, and it may use any reasonable means to divide the property equitably. *Murphy v. Murphy,* 319 S.C. 324, 329, 461 S.E.2d 39, 41–42 (1995). The trial court determined that Wife was entitled to one-half of the entire marital estate. Although Wife received a portion of her property in kind, including a home, a car, and certain personal property, the bulk of her share of the property, more than $2,400,000.00, is invested in the inns. It is apparent from the record that Husband desired to maintain control of all the inns rather than transfer ownership or interest in any of the inns to Wife. The court therefore ordered Husband to make payments on the $2,400,000.00 debt to Wife over a period of 240

---

1. Alternatively, Husband requests this court approve a mortgage as prepared by Husband's counsel. As is more fully discussed in Wife's appeal, we find the issue of the proper form of the mortgage should be remanded for consideration by the trial judge pursuant to his November 3, 1999 order on reconsideration.

months at 6% interest. The court further ordered Husband to execute a note, secured by a mortgage on all properties in which Husband had an interest, with the exception of the residence awarded Husband in the divorce. In return, Husband was declared by the courts to be the sole owner of the marital interests in the inns. The court determined this would be the most equitable way to effect the distribution of Wife's remaining share of the marital property.

The court had the option of forcing the parties to sell the inns and split the proceeds, or dividing the inns between the parties. Husband, however, apparently sought ownership of all the inns. Further, it is an inescapable conclusion that Husband's continued ownership and management of the inns would allow the parties to reap the full financial benefits of the businesses. A distribution of the assets in kind to the parties would leave Wife at a severe disadvantage, as the inns would not have the value for her that they do for Husband. By structuring the division in this manner, the trial court enabled the parties to maintain their optimal stream of income. In doing so, however, Wife has to wait twenty years to receive her full share of the marital property. Having reviewed the overall fairness of the apportionment, we find the end result to be equitable and thus must affirm the trial court's apportionment of the marital estate.

### B. Valuation of Gary Olin Stock

Husband contends the trial court erred in valuing his share of the Gary Olin stock, purchased with funds from an inheritance, at only $30,000.00. He argues, although the share was purchased for $30,000.00, the record shows the value of that one share was actually $122,821.00. Wife asserts the trial court's evaluation correctly incorporated the value of the Olin share in King's Courtyard Inn as stipulated to by the parties' experts.

The record shows the parties stipulated to the values of the various business entities belonging to Husband and Wife, as jointly determined by the parties' two experts. The experts prepared a schedule of the various businesses which contained breakdowns of the values based on the general and limited partnership interests. In valuing the property as of Novem-

ber 30, 1998, the schedule placed a value of $245,644.00 on the parties' 24.81% limited partnership interest in King's Courtyard Inn. A Footnote to this value indicates it was determined based on the payment of $30,000.00 in May of 1997 for a 3.03% limited partnership interest.[2] In other words, if a 3.03% interest were worth $30,000.00, a 24.81% interest would be worth $245,644.00.

One of Husband's witnesses, Mr. Feinberg, placed a value of $90,000.00 on the Olin share in King's Courtyard Inn, based on the 3% share developing into a 9% interest in the business. However, Mr. Feinberg stated Husband's expert witness, Dr. Perry Woodside, would be better able to testify to the value of that share. Wife's expert, Francis Humphries, who worked on the stipulated values with Dr. Woodside, testified the Olin share in King's Courtyard Inn was used to purchase "a 19/54th interest in 75 percent of the Wentworth Mansion equity," leaving a 5.5555% interest in the Wentworth Mansion valued at $14,355.00. There is nothing in the record from Dr. Woodside's testimony indicating he ever placed a value on the Olin share.

On direct examination, Husband testified he purchased a share in King's Courtyard Inn from the widow of Gary Olin with money he received from his aunt's estate. He stated the Olin limited partnership share remained in King's Courtyard Inn. Subsequently, Husband was recalled to the stand to discuss why he disagreed with the valuation of the share as determined by Mr. Humphries. He explained that he purchased a 3.33% interest in the inn from Olin's widow and that refinancing occurred, moving nineteen shares in King's Courtyard Inn to Wentworth Mansion. He stated there were only two limited partnership shares remaining, one of which was the Olin share, the other being one he had previously purchased. According to Husband, he held a limited partnership interest of a little more than 24% and half of that, or 12%, was the Olin share. Accordingly, he determined the value of that

---

2. Although the schedule indicates it is a 3.03% interest, the parties agree this was error and it was actually a 3.33% interest. Following the experts' formula for calculating the value, an error in this percentage amount would lower the total value of the limited partnership interest ($30,000.00 divided by 3.33% times 24.81% equals $223,513.51).

one share to be around $122,000.00, representing half of the total value of the limited partnership as stipulated to by the parties.

The trial court found the value of the Gary Olin stock was $30,000.00, based on Husband's testimony that it stayed in King's Courtyard Inn and was not transferred to Wentworth Mansion, and based on "the value of a share of stock in the King's Courtyard Inn, as stipulated to by the parties."

According to Husband, the one share of stock purchased in May of 1997 for $30,000.00 increased in value to $122,821.00 by November of 1998. Husband makes a compelling argument that, if there are only two shares of limited partnership stock remaining, the value of one share is half of the total value of the limited partnership interest. However, in reviewing the record, it is impossible to discern whether the experts contemplated the 24.82% limited partnership interest comprised only two shares of stock. There is no evidence of record the experts deemed the Olin share of stock transformed from a little more than 3% to more than 12% and represented half of the stipulated $245,644.00 total value of the limited partnership interest. While there is testimony from Husband that only two shares of limited partnership stock remained in King's Courtyard Inn, there is no evidence as to when the twenty-one shares were reduced down to two shares and whether this occurred before or after the November 1998 valuation date. Neither is there any evidence as to whether the experts took the total number of limited partnership shares outstanding into consideration. It is clear they valued the total interest at $245,644.00 and based that value on a purchase price of $30,000.00 for one share representing a little more than 3%, but it is less clear as to whether they would then equate that one share into a 12% interest at the critical time of valuation.

Both parties rely, at least in part, on the experts' stipulated schedule in arguing their values for the stock. This court is not comfortable, however, making a determination that the one share of stock has aggrandized from a $30,000.00 value to more than $122,000.00 in only a year and a half, based in part on the experts' stipulation and in part on Husband's testimony. This is especially so in light of the fact that the full extent

of the experts' opinions on this matter was not detailed by document or by testimony, other than testimony from Wife's expert that the Olin share was transformed into an interest in Wentworth Mansion and was valued at only $14,355.00.[3] However, neither is it clear that the experts would value the Olin share at only $30,000.00 in November of 1998, based on the purchase made in May of 1997. Because we find no clear indication from the experts' stipulated documents as to what value they would have placed on one share of the limited partnership stock at the time of valuation in November 1998, we remand this issue to the lower court for redetermination of the value. In so doing, the court may take additional testimony as offered by the parties on the issue.

### C. Marital v. Non–Marital Property

Next, Husband argues that the family court erred in including the Merrill Lynch account in the marital estate, arguing it is his nonmarital property traced to an inheritance from his aunt. We disagree.

■ Marital property is defined by S.C.Code Ann. § 20–7–473 (Supp.2000) as "all real and personal property which has been acquired by the parties during the marriage and which is owned as of the date of filing or commencement of marital litigation . . . regardless of how legal title is held, except the following, which constitute[s] nonmarital property: (1) property acquired by either party by inheritance, devise, bequest, or gift from a party other than the spouse." The burden of showing an exemption under § 20–7–473 is upon the party claiming that property acquired during the marriage is non-marital. *Pool v. Pool*, 321 S.C. 84, 89, 467 S.E.2d 753, 757 (Ct.App.1996), *aff'd as modified*, 329 S.C. 324, 494 S.E.2d 820 (1998).

■ In this case, Husband claims that three stocks in the Merrill Lynch account are part of his inheritance from his Aunt Kathryn. He asserts, because the account is listed in his name only, and is included in his financial declaration and financial statement provided to banks, the stocks must be

---

3. As previously noted, the trial court found the Olin share remained in King's Courtyard Inn and was not transferred to Wentworth Mansion.

deemed his nonmarital property. However, Husband points to no testimony indicating the three stocks in question came from this inheritance, and the paper trails he provided are woefully inadequate to support his assertion. Appellant has the burden of convincing this court that the trial judge committed error in his findings. *In re Thames*, 344 S.C. 564, 571, 544 S.E.2d 854, 857 (Ct.App.2001); *Shirley v. Shirley*, 342 S.C. 324, 329, 536 S.E.2d 427, 429 (Ct.App.2000).

Further, while property acquired by either party by inheritance from a party other than the spouse is generally considered nonmarital property, nonmarital property may be transmuted into marital property if: (1) it becomes so commingled with marital property as to be untraceable; (2) it is jointly titled; or (3) it is utilized by the parties in support of the marriage or in some other manner so as to evidence an intent by the parties to make it marital property. *Jenkins v. Jenkins*, 345 S.C. 88, 98, 545 S.E.2d 531, 536–37 (Ct.App.2001). Transmutation is a matter of intent to be gleaned from the facts of each case, and the spouse claiming transmutation must produce objective evidence showing that, during the marriage, the parties themselves regarded the property as the common property of the marriage. *Id.*

The evidence here shows that funds from the Merrill Lynch account were used by Husband in support of the marriage or in some other manner, evidencing his intent to make it marital property. Funds from the account were used to pay down the equity line on one of their homes. Funds were used from the account to pay off loans on the inns, as well as purchase more stock in the inns from other investors. The account was also used for improvements to one of the homes, and to pay on the parties' personal credit card. Based on this evidence, the court found that "assets ... listed in the parties' names individually had been co-mingled to an extent as to result in transmutation" and that the parties' "stocks and bonds, with the exception of the stocks held by Wife in the Kerrison's Company, are all marital properties." We find that by commingling the inheritance funds with funds from the parties' marital account so as to become untraceable, and generally using funds from the account to support the marriage, any such assets from the inheritance were transmuted into marital property. We therefore find no error.

D. Miscalculation of the Wife's Share

Finally, Husband argues that the family court made a mathematical error in dividing the marital estate. We find this issue is not preserved for our review.

During the hearing on Husband's motion to amend, Wife pointed out several mathematical errors in the final order. Specifically, she indicated the order reflected a $6,700,000.00 marital estate, when the exact figure should have been $6,720,906.00. She further noted the proper computations on the division of the individual assets would give Husband a total valuation of marital property of $5,739,255.00, and Wife a total valuation of $889,651.00. The trial judge indicated he had simply used the $6,700,000.00 figure as an estimate in some places of the order, but agreed all references to the value could be changed in the order to reflect the exact figure. Husband agreed to the proposed change. The judge also stated he had made an error in arithmetic in the valuation of the total assets awarded to both Husband and Wife, and those figures should be changed to reflect the proper amounts. Again, Husband agreed. The court issued an order modifying the final order and addressing Husband's motion to amend on November 3, 1999. In this supplemental order, the court made the correction involving the total value of the marital estate, finding it should reflect a figure of $6,720,000.00. As well, the court corrected the figures for the total values of the properties awarded to Husband and to Wife, finding they were $5,739,255.00 and $889,651.00, respectively.

On appeal, Husband claims that the November 3, 1999 order modifying the final order contains a mathematical mistake in valuing the entire marital estate at $6,720,000.00. He argues the totals of the properties awarded to Husband ($5,739,255.00) and Wife ($889,651.00) equal $6,628,906.00, not $6,720,000.00. However, these inconsistencies were never brought to the family court's attention. Husband never asserted the $6,720,000.00 figure should be adjusted based on the corrections to the other figures, but conceded at the hearing on his motion to amend that the order should be modified to reflect the $6,720,000.00 figure. The errors complained of by Husband here are being raised for the first time on appeal. The family court has not had an opportunity to

rule upon the issue and therefore, it is not preserved for appellate review. As a general rule, an issue may not be raised for the first time on appeal, but must have been raised to and ruled upon by the court below to be preserved for appellate review. *Noisette v. Ismail,* 304 S.C. 56, 58, 403 S.E.2d 122, 124 (1991) (holding an issue not preserved where the trial court does not explicitly rule on an argument and the appellant fails to make a Rule 59(e), SCRCP motion to alter or amend the judgment on that ground). *See also Wilder Corp. v. Wilke,* 330 S.C. 71, 76, 497 S.E.2d 731, 733 (1998) (issue cannot be raised for the first time on appeal, but must have been raised to and ruled upon by the trial judge to be preserved for appellate review). Because Husband failed to argue this position below, and because he conceded the valuation of which he now complains, we find no preserved error.

## II. Wife's Appeal

### A. Contempt

Wife contends that the trial court abused its discretion by finding her in contempt of court, arguing there is no clear and convincing evidence that she willfully violated any court order. Specifically, she asserts error in the court's findings of contempt for her (1) failure to file proper financial declarations as previously ordered, (2) disclosure of information to Husband's parents and adult daughter regarding Husband's prior adulterous conduct, and (3) intentional withholding of the existence of a trust which was the subject of a motion to compel.

"The power to punish for contempt is inherent in all courts and is essential to preservation of order in judicial proceedings." *In re Brown,* 333 S.C. 414, 420, 511 S.E.2d 351, 355 (1998). Contempt results from the willful disobedience of a court order, and before a court may find a person in contempt, the record must clearly and specifically reflect the contemptuous conduct. *Henderson v. Henderson,* 298 S.C. 190, 197, 379 S.E.2d 125, 129 (1989). A willful act is one which is "done voluntarily and intentionally with the specific intent to do something the law forbids, or with the specific intent to fail to do something the law requires to be done; that is to say, with bad purpose either to disobey or disregard the law." *Spartanburg County Dept. of Soc. Servs. v. Padgett,* 296 S.C.

79, 82–83, 370 S.E.2d 872, 874 (1988). "In a proceeding for contempt for violation of a court order, the moving party must show the existence of the order, and the facts establishing the respondent's noncompliance." *Brasington v. Shannon*, 288 S.C. 183, 184, 341 S.E.2d 130, 131 (1986). Once the moving party has made out a prima facie case, the burden then shifts to the respondent to establish his or her defense and inability to comply with the order. *Henderson*, 298 S.C. at 197, 379 S.E.2d at 129. A determination of contempt is within the sound discretion of the trial judge, but his decision will be reversed when the finding is without evidentiary support or there is an abuse of discretion. *Wilson v. Walker*, 340 S.C. 531, 538, 532 S.E.2d 19, 22 (Ct.App.2000).

1. Financial Declaration

A pretrial order was filed on January 11, 1999, which directed the parties, in part, to "provide current financial declarations within ten days," and to have all real property appraised, with the appraisals to be completed by January 30, 1999. Husband subsequently filed a motion to compel Wife to submit a complete and updated financial declaration, "indicating the values of assets." Following a hearing on the matter, the court, by order filed January 25, 1999, ordered Wife to "provide a current, complete financial declaration, including an assets addendum, to [Husband's] attorney within twenty-four (24) hours." Wife submitted a financial declaration signed January 26 which included valuations for some of the assets, but noted the appraisals were not complete as to the values of the real estate, and therefore did not include those values nor the total value of all assets. At trial, Wife submitted a final financial declaration, which included all property values of the assets.

Wife asserts she complied with the January 25 order "as best she could," given that the appraisals were incomplete. According to the January 11 order, Wife had until January 30 to complete the appraisals of the real property. However, Wife offers no excuse as to why she did not submit an updated financial declaration, complete with an asset addendum including the appraised values, as of January 30. The January 11 and January 25 orders clearly instructed the Wife to provide this information by that date. Further, there is no evidence

Wife requested additional time from Husband or moved the court for additional time, based on an inability to complete the appraisals as ordered. In spite of the clear orders of the court, Wife waited to submit the proper financial declaration at the trial on February 16, thereby depriving Husband of an opportunity to completely prepare his case. Accordingly, we find the evidence supports the trial judge's finding of willful contempt as to the financial declaration.

### 2. Disclosure of Information

On December 11, 1998, the court ordered Husband's psychiatrist to produce Husband's file to Wife and ordered that "the contents of the file shall not be disseminated except as needed in the course of this litigation and under no circumstances are the parties' minor children to be told any of the information in [Husband's] file." On January 27, 1999, the court issued a protective order restraining the parties "from disseminating any information learned in any deposition in this case which relates in any way to, or is derived from, information contained in the records of the parties' therapists, with any person except his or her lawyer, his or her expert, and his or her parents and siblings."

Notwithstanding these orders, during a very emotional phone conversation with Husband's parents, Wife disclosed information of an affair Husband had in 1983, which she discovered after reviewing his psychological records. Wife stated during her cross-examination testimony that she told Husband's parents about the previous affair because they had accused her of stalling the case, and she was hurt and "felt so slammed" by the conversation with his parents. She admitted, however, that she knew she was under a court order not to disclose this information, and that she was guilty of violating the order.

On appeal, Wife asserts she only disclosed this information to Husband's parents while defending herself against unwarranted attacks, and she "believed she was within her rights to divulge this information as necessary to the litigation." This position is directly contrary, however, to her admission at trial that she knew she was under a court order not to disclose the information and that she was in violation of the order. Ac-

cordingly, there is evidentiary support for the trial court's finding on this issue, and we find no abuse of discretion.

Wife also asserts on appeal that the trial court erred in finding her in contempt for disclosing Husband's prior adulterous conduct to Husband's adult daughter from a previous marriage. We agree. The record shows Wife informed Husband's adult daughter as to Husband's ongoing adulterous relationship with Linn Lesesne, not the prior adulterous conduct of Husband that occurred in 1983. Further, there is no evidence the orders in question had even been issued at the time of Wife's conversation with her stepdaughter. There is simply no evidence that Wife disclosed anything to the Husband's daughter which she was prohibited from disclosing by court order. Accordingly, we reverse so much of the court's order as finds Wife in contempt for disclosing information to Husband's daughter, for lack of evidentiary support.

### 3. Failure to Disclose the Trust

■ On January 20, 1999, Husband filed a motion to compel T. Heyward Carter, Jr., one of the estate planning attorneys for Wife's parents, to fully comply with the subpoena which demanded that he produce any trust documents involving Wife. Husband argued he was trying to find "a present existing trust from which [Wife was] deriving real money, which . . . would affect [Husband's] alimony payment." On February 5, 1999, the family court filed its order requiring Mr. Carter to produce any original trust documents in which Wife was named as a beneficiary. Thereafter, Husband discovered an insurance trust on Wife's parents naming Wife and her siblings as beneficiaries. This trust was established to pay the estate taxes of Wife's parents' estate, effective only upon the death of both her parents. Consequently, on February 14, 1999, Husband filed a motion to hold Wife in contempt for failing to disclose the existence of this trust.

Wife argues on appeal that the family court erred in finding her in contempt for failing to disclose the existence of this trust. We agree. In the final order, the court held, "I find the Wife to be in wilful contempt for intentionally withholding the existence" of "a trust which was subject to the Motion to Compel heard by this Judge." However, there is no evidence

that Wife willfully withheld this information because nothing in the record indicates that she was even aware of the existence of the trust. Wife testified at trial that she was not aware of the existence of the trust, and the record contains no evidence that the existence of the trust was ever communicated to her or that she tried to conceal it. Moreover, Wife was not the subject of Husband's motion to compel, nor was she included in the court's order compelling disclosure of the trust documents. Accordingly, we find that the court erred in holding Wife in contempt on this basis.

### B. Uncovered Medical Expenses

Wife argues that the trial court erred or abused its discretion by ordering her to be responsible for all uncovered medical, dental and orthodontic expenses.[4] She argues the family court undertook to apply the Child Support Guidelines and, thus, should not have deviated from them by requiring her to be responsible for the uncovered expenses. We disagree.

According to 27 S.C.Code Ann. Reg. 114–4710(A)(3) (Supp.2000), where the combined parental gross income is higher than $15,000.00 per month, or $180,000.00 per year, the family court should determine child support awards on a case-by-case basis. In this case, the combined gross income of the parties is $490,000.00 per year. Thus, the Child Support Guidelines do not cover this case. The family court referenced the child support guidelines and concluded, by extrapolation, Husband would have been responsible for monthly child support of $4,400.00. However, the court determined, based on the equitable division award Wife received, Husband should pay only $3,500.00 per month in child support. The court further ordered "Husband shall continue to carry medical and dental insurance for the benefit of the minor children, but that the Wife shall be responsible for all uncovered medical, dental and/or orthodontic expenses of the children."

---

4. Husband concedes, notwithstanding the language of the order making Wife responsible for **all** uncovered medical, dental and orthodontic expenses, Wife would be entitled to seek contribution from Husband in the event of some exceptional circumstance resulting in inordinate expenses.

Contrary to Wife's assertion, the court did not apply the Child Support Guidelines. Further, the court properly considered the specific facts of this case in determining an appropriate award. The court acted within its statutory authority and the overall award was reasonable and equitable. Accordingly, we find no error.

### C. Alimony and Child Support

Wife next argues that the issues of alimony and child support must be revisited if Husband prevails in his appeal of the apportionment of the marital property. Because we have affirmed the family court's apportionment of the marital estate, it is not necessary to address this issue.

### D. Note and Mortgage

Finally, Wife argues that the trial court abused its discretion by not ordering Husband to execute a note and mortgage similar to those provided by Husband to his commercial creditors. We find no error.

Following the court's amended final order, Husband filed an emergency motion to require the note and mortgage pursuant to the final order be executed and recorded, to lift any stay which may exist pertaining to said note and mortgage, and for attorneys' fees and costs. However, because notice of appeal had already been filed, the family court determined it was without jurisdiction to hear the motion. Thus, the last order addressing the issue of the note to be executed is the November 3, 1999 order modifying the final order. In that order, the court directed the preparation of the note and mortgage by "an independent attorney practiced and well versed in real estate and business transactions." On the same date, the trial judge notified the parties he had chosen Attorney Tom Buist to draft the documents. According to both parties, the note and mortgage were never drawn.

Because appeal was taken before preparation of the note and mortgage, it is impossible to say whether the lower court erred in failing to order the execution of the same pursuant to the parties' individual desires. Indeed, both parties assert on appeal that the court erred in failing to choose the type of note and mortgage they requested; however, we do not yet know if

the executed documents will comply with their wishes. The court's final order on this matter has never been followed, and we cannot find error where there is no final determination on the matter. We find the appeal of this issue to be premature and therefore remand it to the family court to take the appropriate actions necessary to enforce the ordered distribution of the marital estate.

Based upon the foregoing, the decision of the trial court is

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

GOOLSBY and STILWELL, JJ., concur.