# THE STATE OF SOUTH CAROLINA
## In The Court of Appeals

Jane E. Baskin, Respondent,

v.

William B. Walkup, Appellant.

Appellate Case No. 2022-001226

---

Appeal From Richland County
Amy W. McCulloch, Probate Court Judge

---

Opinion No. 6094
Heard September 12, 2024 – Filed January 15, 2025

---

**AFFIRMED**

---

Thornwell F. Sowell, III, and Bess Jones DuRant, both of
Sowell & DuRant, of Columbia, and Sarah P. Spruill, of
Haynsworth Sinkler Boyd, PA, of Greenville, all for
Appellant.

Richard C. Detwiler and Harry Alwyn Dixon, both of
Callison Tighe & Robinson, LLC, of Columbia, for
Respondent.

---

**THOMAS, J.:** William B. Walkup appeals several probate court orders, arguing
the probate judge erred in (1) removing him as the trustee of a trust benefitting
Jane E. Baskin; (2) failing to recuse herself; (3) finding him in contempt; and (4)
failing to award him attorney's fees and awarding attorney's fees to Baskin. We
affirm.

**FACTS**

Baskin's father, Eldridge Baskin, died in September 1990. Baskin, his only child, was bequeathed, *inter alia*, a house and its contents on Summerlea Drive in Columbia. At the time, Baskin was approximately forty-three years old and had cerebral palsy. The remainder of the estate was placed in a trust "to be held, administered[,] and distributed as hereinafter provided for the sole benefit of" Baskin "to provide for the well[-]being of . . . Baskin so long as she shall live." The will further indicated:

> the provisions thereof are to be construed in the light of this purpose and while this shall not have the effect of limiting in any way the power, authority[,] or discretion of the trustee hereunder, it shall at all times be borne in mind by the trustee when considering the matter of any encroachment upon the principal of the trust . . . .

Walkup was named as the trustee. The trust was funded with liquid assets valued at more than $130,000 and a rental home valued at more than $40,000.

The will directed the trustee to

> receive, take[,] and hold the properties and assets of the trust created hereunder and shall invest and reinvest the same, and collect and receive the income therefrom, and, after payment therefrom of all proper costs, charges[,] and expenses, shall dispose of the net income and principal for the benefit of . . . Baskin as follows:
>
> (1) So long as . . . Baskin . . . shall live, the trustee shall pay to or apply for the benefit of [Baskin] all of the net income of the trust in such manner as my trustee shall deem suitable.
> (2) My trustee may, and shall be authorized and empowered, in its complete and absolute discretion, to encroach upon and make disbursements from principal to or for the benefit of . . . Baskin, at any time

and from time to time, in such amount as my trustee may deem proper, for the medical care, comfortable maintenance, and welfare of [Baskin] . . . .

(3) Upon the death of . . . Baskin, the remaining property of this trust . . . shall be divided and paid over and distributed to those persons then living who would then be my heirs . . . as if I had then died intestate.

The trustee was given broad powers over the management of the estate, including the power to invest in partnerships and "to deal with itself in its separate, or any fiduciary, capacity."

Baskin filed this action in July 2020, seeking removal of Walkup and an accounting. Both parties moved for summary judgment. The probate court denied both motions and appointed a guardian ad litem (GAL). The matter proceeded to trial on January 4, 2021.

Baskin lived in the family home on Summerlea Drive from 1959 until June 2015, when against her wishes, she moved to an apartment complex owned by Walkup because the complex was closer to his office and he believed expenses were too high at the Summerlea Drive house. The apartment was not accessible, which Baskin required for her wheelchair. Baskin testified she told Walkup she wanted to go back to the house rather than pay rent at the apartment; instead, Walkup attempted to move her to a nursing home. Baskin refused to move to the nursing home and began renovating her house on Summerlea Drive.

According to Baskin's testimony, out of her monthly income of $860 per month, she paid for her food, utilities at the Summerlea Drive house, insurance, cable, dog expenses, and clothing. Baskin testified Walkup discussed the trust with her one time, in 2008, after she retained a lawyer who requested an accounting. When Baskin asked Walkup about one accounting, he told her she did not need to know more. In 2017, Baskin retained another lawyer, Alex Weatherly, who requested another accounting. By letters dated August 10 and August 24, 2017, Walkup reminded Baskin the house on Summerlea Drive belonged to her and, although the trust had been paying the insurance and electric bills on the house, it would discontinue paying them beginning in October. Baskin testified she had been paying the Summerlea Drive utility expenses since then, and her friend, Michele

Moseley, had been paying the insurance. On May 14, 2018, Baskin and Moseley sent a letter to Walkup telling him not to directly contact Baskin and to correspond through her attorney. By letter to Walker, Weatherly confirmed the request and stated Baskin demanded, *inter alia*, $6,500 per month from the trust.

Baskin testified she had known Moseley for thirty-seven years, and named her as a general and health care power of attorney in 2017. Moseley was also acting as one of Baskin's caretakers. Baskin maintained she needed a caregiver for ten hours a day rather than the forty hours per week the trust was paying for, and Baskin wanted to be able to pay Moseley for her caregiving time, which Walkup refused to do. Baskin testified she could pay her own bills and had a checking account and credit card. Moseley began providing care to Baskin in 2017. Moseley testified Baskin was capable of handling her money; paid her bills each month; and could live within a monthly budget. Moseley also testified she was not paid for her assistance because Walkup refused to pay her. Moseley testified she became Baskin's power of attorney at Weatherly's request and she primarily exercised power only to sign checks for Baskin. Moseley claimed she did not create the breakdown of Baskin's relationship with Walkup, which was "already sour." In addition, Moseley testified she could not work with Walkup as trustee because he did not "like" her.

Kenneth Wingate, an attorney and former CPA, testified he was certified as a specialist in the area of trust and estate law. Wingate testified the South Carolina Code of Laws required a trustee to meet the needs of the beneficiary in a "reasonable and proper and skillful" manner, which Walkup failed to do based on his review of the record regarding, *inter alia*, the lack of direct communication between Baskin and Walkup for two years and Walkup's apparent disregard and disrespect of Baskin.

Walkup testified he was eighty years old and had known Baskin since she was eleven months old. He agreed to be the trustee because he believed he could help. According to Walkup, he moved Baskin to his apartment complex because she began falling, and there, his daughter could and did assist Baskin. Walkup testified Baskin should be in a nursing home because she needed 24/7 care. He also testified Baskin required $14,400 per month to live in the Summerlea Drive house, which would deplete the trust within three years. In comparison, Walkup maintained the nursing home would cost $6,600 per month or more depending on the level of care Baskin required. Walkup believed Baskin resented that her father did not leave the estate directly to her and testified his relationship with Baskin deteriorated much more when Moseley became involved. Walkup testified

regarding the vast increase in corpus of the trust during the period of his trusteeship, which grew from approximately $135,000 to more than $500,000.

On the third morning of trial, January 6, 2021, the parties agreed to a "temporary suspension of the litigation in an effort to truly come to a resolution . . . ." The parties entered a temporary settlement agreement, which they filed with the probate court. Walkup remained the trustee solely for investment and tax reporting purposes; Alex Weatherly was appointed as a special trustee for Baskin's care; and Walkup was to provide a monthly payment to Weatherly on behalf of Baskin. Baskin was to move to the Summerlea Drive house by February 1, 2021.

In February 2021, Baskin filed a motion for temporary attorney's fees. Walkup filed a memorandum in opposition to the court's request for a proposed order granting Baskin attorney's fees. At an October 2021 status conference/emergency hearing, the court indicated its intent to award attorney's fees. According to Baskin, Walkup, "for the first time at the status conference," maintained the settlement agreement had expired; thus, the court considered the matter an emergency and set a hearing for that afternoon. By order filed October 29, 2021, the court rejected Walkup's contention that the temporary order expired and granted Baskin's request to increase the monthly payments. The court also set the remainder of the trial for December 2021.[1]

On November 19, 2021, Walkup filed a motion for recusal, arguing the probate judge's bias was indicated by her willingness to rule against Walkup regarding attorney's fees before fully hearing from him. Walkup relied on an email from the clerk of court to Baskin's counsel requesting an order granting fees and a statement made by the court at the emergency hearing. By order filed December 16, 2021, the court stayed the proceeding until it could hear the motion for recusal. Walkup filed an emergency motion dated December 30, 2021, seeking investigation by the GAL based on anonymous telephone calls he received regarding Baskin's care. The court reappointed the GAL. Baskin filed an amended petition for temporary attorney's fees. By order filed April 28, 2022, the court denied the motion for recusal.

In June 2022, Walkup filed a civil action in Lexington County as the trustee against Weatherly and Moseley. Baskin filed a Motion for Order and Rule to Show Cause (Contempt) or in the Alternative, Motion to Enforce Settlement and for Sanctions.

---

[1] The trial did not continue until August 5, 2022.

When the trial continued, Walkup introduced the affidavits and deposition transcripts of numerous witnesses in lieu of testimony. The GAL testified she first visited Baskin in October 2020 at the apartment, which she found was not accessible. At the time, Baskin was receiving paid care for twenty-four hours per week. In addition, Moseley provided care for twelve hours per week. The GAL expressed concern at that time regarding Baskin's inability to afford food, incontinence supplies, medications, and other expenses, such as a custom-fitted wheelchair. The GAL recommended funds from the trust be released to provide for the renovations to the Summerlea Drive house. She also recommended a professional fiduciary service be hired as the trustee. The GAL opined Baskin should be provided a monthly budget, which she was capable of managing. In May and June of 2022, the GAL again visited Baskin, this time at the Summerlea Drive house. The GAL testified Baskin was happy at the Summerlea Drive house; the rooms were "very nice [with] wide-open space for her to walk through and utilize her wheelchair"; the shower was an appropriate roll-in shower; the kitchen was well-stocked; and the area was very clean. In addition, the GAL found no financial concerns.

The GAL opined Baskin needed consistent medical supervision and recommended, *inter alia*, 24/7 care by licensed caregivers; a licensed healthcare provider under a doctor's supervision; a background check on the live-in caregiver/tenant; and a certified geriatric care manager that was not in a caregiver role. In response to a question whether there was evidence Baskin was being unduly influenced by Moseley, the GAL testified Baskin was willing to go along with others' actions in order to stay in her house, but the GAL did not observe anyone exerting influence on Baskin to do something she did not want to do. When asked if the fact that Moseley was the beneficiary of the Summerlea Drive house upon Baskin's death changed her answer, the GAL testified, "No."

On behalf of Walkup, Albert L. Moses, a trust and estate attorney, opined it was more important for the trustee to follow the testator's instructions than to maintain a good relationship with the beneficiary. He also found Walkup's management of the trust based on its financial performance to be "remarkable."

The court removed Walkup as trustee based on, *inter alia*, (1) best serving Baskin; (2) a substantial change in circumstances in the relationship between Walkup and Baskin, which had "deteriorated to a toxic level of litigation"; and (3) requested by Baskin, best serving the trust, and not inconsistent with a material purpose of the trust. The court noted a suitable trustee was immediately available because

Weatherly had been serving, and Baskin was competent with Weatherly's and Moseley's assistance, to find a suitable replacement. The court also found Walkup in contempt and in breach of the temporary settlement agreement and ordered Walkup to pay Baskin's attorney's fees of $3,500 for having to bring a motion for sanctions. Finally, the court awarded Baskin attorney's fees of $129,625.80. The court denied Walkup's motion for attorney's fees. This appeal followed.

## STANDARD OF REVIEW

"An appellate court's determination of the standard of review for matters originating in the probate court is controlled by whether the cause of action is at law or in equity." *Holcombe-Burdette v. Bank of Am.*, 371 S.C. 648, 654, 640 S.E.2d 480, 483 (Ct. App. 2006). An action to remove a trustee is equitable in nature. *Floyd v. Floyd*, 365 S.C. 56, 93, 615 S.E.2d 465, 485 (Ct. App. 2005), *overturned on other grounds by* 2008 S.C. Acts 211, § 1. "[I]f the probate proceeding is equitable in nature, the [appellate] court, on appeal, may make factual findings according to its own view of the preponderance of the evidence." *Matter of Howard*, 315 S.C. 356, 362, 434 S.E.2d 254, 257-58 (1993). In any event, the parties here filed cross motions for summary judgment. "When the parties file cross-motions for summary judgment, the issue becomes a question of law for the [c]ourt to decide de novo." *S.C. Pub. Int. Found. v. Calhoun Cnty. Council*, 432 S.C. 492, 495, 854 S.E.2d 836, 837 (2021). "Therefore, we need not determine whether there are genuine issues of fact; instead, we are only concerned with the resolution of the questions of law." *S.C. Pub. Int. Found. v. City of Columbia*, 431 S.C. 164, 167, 847 S.E.2d 257, 258 (Ct. App. 2020).

## LAW/ANALYSIS

### A.    REMOVAL AS TRUSTEE

Walkup argues the probate court erred in removing him as trustee based on Baskin's best interests and the deterioration of the parties' relationship by failing to consider the language of the will as a whole; in misapplying the applicable law in its analysis of the duties of a trustee; in its analysis of section 62-7-706 of the South Carolina Code; and in failing to respect the naming of him as trustee in the will. We disagree.

A trustee may be removed by the court if:

(3) because of unfitness, unwillingness, or persistent
failure of the trustee to administer the trust effectively,
the court determines that removal of the trustee best
serves the interests of the beneficiaries; or
(4) there has been a substantial change of circumstances
or removal is requested by all of the qualified
beneficiaries, the court finds that removal of the trustee
best serves the interests of all of the beneficiaries and is
not inconsistent with a material purpose of the trust, and
a suitable cotrustee or successor trustee is available.

S.C. Code Ann. § 62-7-706(b) (2022).  The comments to section 62-7-706 further
provide:

A trustee may be removed for untoward action, such as
for a serious breach of trust, but the section is not so
limited.  A trustee may also be removed under a variety
of circumstances in which the court concludes that the
trustee is not best serving the interests of the
beneficiaries.  The term "interests of the beneficiaries"
means the beneficial interests as provided in the terms of
the trust, not as defined by the beneficiaries.

§ 62-7-706 at cmt.  "Friction between the trustee and beneficiaries is ordinarily not
a basis for removal.  However, removal might be justified if a communications
breakdown is caused by the trustee or appears to be incurable." *Id.*  A trustee may
also be removed "when removal would be in the best interests of the estate . . . ."
S.C. Code Ann. § 62-3-611(b) (2022).

We agree with Walkup's argument that the will provided him with broad powers
over the trust.  However, we disagree with his assertion that the probate court
misconstrued the will by focusing on the phrase, "to provide for the well[-]being
of" Baskin.  The will required the trust be used "for the sole benefit of my
daughter, Jane E. Baskin, the sole purpose of the trust created hereunder being to
provide for the well[-]being of Jane E. Baskin so long as she shall live."  Thus, the
primary purpose of the will and the creation of the trust was to benefit Baskin.  *See
King v. S.C. Tax Comm'n*, 253 S.C. 646, 649, 173 S.E.2d 92, 93 (1970) ("The
primary purpose in construing a will is to determine from the entire instrument the
intent of the testators as expressed in the words used.").

Although Walkup's financial expertise was apparent in the manner in which he invested and grew the trust corpus, the record was replete with evidence that long-term growth rather than Baskin's well-being was Walkup's primary concern. *See* Restatement (Second) of Trusts § 107, cmt. a on cl. (a) ("A court may remove a trustee if his continuing to act as trustee would be detrimental to the interests of the beneficiary."). Included in the probate court's reasons for removing Walkup as trustee were Baskin's best interests and a substantial change of circumstances in the relationship between Walkup and Baskin. Furthermore, there was a suitable successor trustee, Weatherly, until Baskin was able to replace the trustee with his assistance. We find the record supports removal and the probate court did not err in its analysis of the will or governing law.

Walkup next argues the probate court erred in applying the applicable law regarding the duties of the trustee as to (1) the duty to report; (2) the ability of the trustee regarding self-dealing; (3) the prudent investor rule; and (4) the statute of limitations regarding accountings. Because we affirm the removal of Walkup as trustee based on Baskin's best interests and the deterioration of the parties' relationship, we decline to address the other grounds the probate court found for removal. *See Futch v. McAllister Towing of Georgetown, Inc.*, 335 S.C. 598, 613, 518 S.E.2d 591, 598 (1999) (declining to address the appellant's remaining issues where resolution of a prior issue was dispositive).

## B. RECUSAL

Walkup argues the probate judge erred in not recusing herself. We disagree.

"The decision to recuse is within the discretion of the trial judge." *Ness v. Eckerd Corp.*, 350 S.C. 399, 404, 566 S.E.2d 193, 196 (Ct. App. 2002). "Under South Carolina law, if there is no evidence of judicial prejudice, a judge's failure to disqualify himself will not be reversed on appeal." *Patel v. Patel*, 359 S.C. 515, 524, 599 S.E.2d 114, 118 (2004). "[A] judge should disqualify himself in a proceeding in which his impartiality might reasonably be questioned, including but not limited to, instances where he has a personal bias or prejudice against a party." *Id.* (citing Canon 3(E)(1)(a) of Rule 501, SCACR). However, "[i]t is not sufficient for a party seeking disqualification to simply allege bias; the party must show some evidence of bias or prejudice." *Id.* "[A] judge's impartiality might reasonably be questioned when his factual findings are not supported by the record." *Ellis v. Procter & Gamble Distrib. Co.*, 315 S.C. 283, 285, 433 S.E.2d 856, 857 (1993).

We find no evidence in the record suggesting that Judge McCulloch was biased and we likewise find her factual findings were supported by the record. Walkup based his motion for recusal on the email request to Baskin's counsel in July 2021 to prepare an order granting temporary attorney's fees and on Judge McCulloch's comments during the status conference/emergency hearing. As to the email, Baskin moved for temporary attorney's fees in February 2021. Rather than responding to the motion, Walkup moved to recuse Judge McCulloch. Regarding the emergency hearing, Walkup asserted he based his motion for recusal on Judge McCulloch's statement that she was going to award Baskin attorney's fees, which Walkup argued was premature because he had not presented his case. Although Judge McCulloch stated at the hearing that she was going to award Baskin attorney's fees, in the order, no attorney's fees were granted as a result of the emergency hearing and Judge McCulloch stated the issue of attorney's fees "is still an issue to be decided." We find no evidence of bias and accordingly affirm the denial of the motion for recusal. *See Patel*, 359 S.C. at 525, 599 S.E.2d at 119 ("Disqualification issues are necessarily decided on the facts of each case."); *Reading v. Ball*, 291 S.C. 492, 494, 354 S.E.2d 397, 398 (Ct. App. 1987) ("It is not enough for a party to allege bias; a party seeking disqualification of a judge must show some evidence of bias or prejudice.").

## C.    CONTEMPT

Walkup argues the probate court erred in finding him in contempt because the temporary settlement agreement did not forbid him from filing an action in Lexington County. The court found the agreement temporarily stayed the action and Walkup violated the stay by commencing the action and by misrepresenting in it that he was the trustee of the trust.

"The determination of contempt ordinarily rests within the sound discretion of the trial judge." *Ex parte Kent*, 379 S.C. 633, 637, 666 S.E.2d 921, 923 (Ct. App. 2008). "On appeal, a decision regarding contempt should be reversed only if it is without evidentiary support or the [circuit court] has abused [its] discretion." *Stone v. Reddix-Smalls*, 295 S.C. 514, 516, 369 S.E.2d 840, 840 (1988). "Civil contempt must be proven by clear and convincing evidence." *Poston v. Poston*, 331 S.C. 106, 113, 502 S.E.2d 86, 89 (1998). "Contempt results from the willful disobedience of a court order and before a person may be held in contempt, the record must be clear and specific as to acts or conduct upon which the contempt is based." *Ex parte Kent*, 379 S.C. at 637, 666 S.E.2d at 923. "A willful act is one which is 'done voluntarily and intentionally with the specific intent to do something the law forbids, or with the specific intent to fail to do something the

law requires to be done; that is to say, with bad purpose either to disobey or disregard the law.'" *Miller v. Miller*, 375 S.C. 443, 454, 652 S.E.2d 754, 759-60 (Ct. App. 2007) (quoting *Widman v. Widman*, 348 S.C. 97, 119, 557 S.E.2d 693, 705 (Ct. App. 2001)).

We find clear and convincing evidence exists to affirm the finding of contempt. The temporary agreement was filed as an order by the probate court, stating "[t]he litigation in this matter is stayed and all issues not decided are held in abeyance with full reservation of rights . . . ." The agreement concluded, "[t]he parties agree that this settlement agreement will be a temporary solution to determine its feasibility moving forward and the parties will report to the Court in 6 months' time . . . ." Finally, the probate court's orders regarding the emergency hearing and denying the motion for recusal both affirmed the agreement. In the October 29, 2021 order regarding the emergency hearing, the court stated, "[t]he parties participated in reaching the Temporary Settlement Agreement with the aid of this Court, which approved the Agreement, filed it, and made it a part of the record in this case. . . . The Temporary Settlement Agreement . . . is enforceable by this Court." The order denying Walkup's motion for recusal, dated April 28, 2022, stated "[t]he Temporary Settlement Agreement . . . shall remain in place until final judgment." Walkup filed his civil action in Lexington County in June 2022, after these orders were issued. We find Walkup's filing of an action in another jurisdiction raising the same issues was willful disobedience of the order incorporating the settlement agreement; thus, we affirm the finding of contempt.

## D. ATTORNEY'S FEES

Walkup summarily argues that "[i]n the event this matter is reversed, the award of attorney's fees to Baskin must be reversed, and attorney's fees and costs should be awarded to Walkup as . . . the prevailing party . . . ." Walkup does not otherwise appeal the award of attorney's fees. Based on our affirmance of the matter on the merits, we affirm the award of attorney's fees.

## CONCLUSION

For the foregoing reasons, the orders on appeal are

**AFFIRMED.**

**HEWITT and VINSON, JJ., concur.**