536 S.E.2d 427

John SHIRLEY, Appellant,

v.

Sheila SHIRLEY, Respondent.

No. 3233.

Court of Appeals of South Carolina.

Heard June 6, 2000.

Decided July 31, 2000.

James W. Tucker, Jr., of Rock Hill, for appellant.

Douglas A. Barfield, Jr., of Lancaster, for respondent.

Thomas F. McDow, of Rock Hill, for Guardian ad Litem.

ANDERSON, Judge:

John Shirley appeals the family court's denial of his request for a change of custody. We affirm as modified herein.

## FACTS/PROCEDURAL BACKGROUND

John Shirley (the father) and Sheila Shirley (the mother) were divorced by order of the family court dated May 6, 1994. Pursuant to the divorce decree, the mother was granted custody of the parties' two minor daughters, Amanda (born February 24, 1987) and Tabitha (born June 19, 1990).

The father instituted this action for a change of custody in January 1996. The mother answered, admitting certain factual allegations made in the father's complaint, but denying he was entitled to a change of custody. A guardian ad litem was appointed to represent the children pursuant to a consent order.

After a hearing, the family court issued its order, leaving custody with the mother. The court required the father to pay the mother's attorney's fees of $2,692.50 as well as the guardian ad litem's fees. This appeal followed.

## STANDARD OF REVIEW

On appeal from the family court, this court has jurisdiction to find facts in accordance with its own view of the preponderance of the evidence. *Epperly v. Epperly,* 312 S.C. 411, 440 S.E.2d 884 (1994). This broad scope of review, however, does not relieve the appellant of the burden of convincing us that the family court committed error. *Skinner v. King,* 272 S.C. 520, 252 S.E.2d 891 (1979). Nor are we required to ignore the fact that the trial judge, who saw and heard the witnesses, was in a better position to evaluate their credibility and assign comparative weight to their testimonies. *Cherry v. Thomasson,* 276 S.C. 524, 280 S.E.2d 541 (1981). Because the appellate court lacks the opportunity for direct observation of witnesses, it should accord great deference to trial court findings where matters of credibility are involved. *See Aiken County Dep't of Soc. Servs. v. Wilcox,* 304 S.C. 90, 403 S.E.2d 142 (Ct.App.1991). "This is especially true in cases involving the welfare and best interests of children." *Id.* at 93, 403 S.E.2d at 144.

## LAW/ANALYSIS

### I. Custody

The father argues the family court erred in failing to grant him custody of the child. We disagree.

 In all child custody controversies, the controlling considerations are the child's welfare and best interests. *Cook v. Cobb,* 271 S.C. 136, 245 S.E.2d 612 (1978). In reaching a determination as to custody, the family court should consider how the custody decision will impact all areas of the child's life, including physical, psychological, spiritual, educational, familial, emotional, and recreational aspects. *Pountain v. Pountain,* 332 S.C. 130, 503 S.E.2d 757 (Ct.App.1998). Additionally, the court must assess each party's character, fitness, and attitude as they impact the child. *Id.* at 136, 503 S.E.2d at 760. "There exist no hard and fast rules for determining when to change custody and the totality of the circumstances peculiar to each case constitutes the only scale upon which the ultimate decision can be weighed." *Davenport v. Davenport,* 265 S.C. 524, 527, 220 S.E.2d 228, 230 (1975).

 In order for a court to grant a change of custody based on changed circumstances, the party seeking the change must meet the burden of showing changed circumstances occurring subsequent to the entry of the order in question. *Baer v. Baer,* 282 S.C. 362, 318 S.E.2d 582 (Ct.App.1984); *see also Bolding v. Bolding,* 278 S.C. 129, 130, 293 S.E.2d 699, 700 (1982) ("In order to justify a change of custody, the party seeking the transfer bears the burden of establishing a material change of conditions substantially affecting the welfare of the child."). "A change in circumstances justifying a change in the custody of a child simply means that sufficient facts have been shown to warrant the conclusion that the best interests of the child will be served by the change." *Pitt v. Olds,* 333 S.C. 478, 481, 511 S.E.2d 60, 61 (1999); *see also Skinner v. King,* 272 S.C. 520, 523, 252 S.E.2d 891, 892–93 (1979). "(T)he change of circumstance relied on for a change of custody must be such as would substantially affect the interest and the welfare of the child, not merely the parties, their wishes or convenience" *Sharpe v. Sharpe,* 256 S.C. 517, 183 S.E.2d 325 (1971) (citing *Ford v. Ford,* 242 S.C. 344, 130 S.E.2d 916; *Pullen v. Pullen,* 253 S.C. 123, 169 S.E.2d 376.) The circumstances warranting a change in custody must occur after the date of the original custody order. *Henggeler v. Hanson,* 333 S.C. 598, 510 S.E.2d 722 (Ct.App.1998). Custody decisions are matters left largely to the discretion of the trial court. *Stroman v. Williams,* 291 S.C. 376, 353 S.E.2d 704

(Ct.App.1987). Furthermore, the appellate court should be reluctant to substitute its own evaluation of the evidence on child custody for that of the trial court. *Woodall v. Woodall,* 322 S.C. 7, 471 S.E.2d 154 (1996).

## A. Mother's Failure to Administer Appropriate Medication to the Children

██ The father asserts the family court erred in failing to find that the mother's failure to properly administer medication to the children constituted a change of circumstances warranting a change of custody. We disagree.

Both children have epilepsy, which is controlled with anti-convulsive medication. Dr. Jan Shaw, the children's treating neurologist, set the prescribed dosages at therapeutic levels established through medical testing. She testified that lowering the medication dosage could result in "breakthrough" seizures and she would be concerned if one of the parents lowered the medication dosage without contacting her. She further testified that possible side effects of the medication include drowsiness, fatigue, stomachaches, difficulty with gait, and personality changes.

It is uncontested the mother reduced Tabitha's dosage of the anti-convulsive medication on one occasion for a period of fifteen days. The mother apparently made this decision because Tabitha was experiencing adverse side effects from the medication, including difficulty staying awake in school. The child did not suffer any breakthrough seizures during the time the mother reduced her medication.

The father testified the mother failed, on a number of occasions, to make sure the children had adequate amounts of their medication with them when they visited with him. He stated he would at times be forced to get a prescription filled during his visitation with the children. Nonetheless, he opined it was the responsibility of the parent who had the children at the time the medication ran out to get the prescriptions filled. The mother denied the children were ever without medication.

The family court noted the mother has resumed giving the child's normal dosage of medication and there is no evidence the child was harmed due to the temporary reduction in the

prescribed dosage. The court observed the mother and father both purchased medication for the children and they are equally responsible the children's uninsured medical costs.

While we share in the father's concern regarding the mother's decision to temporarily reduce Tabitha's prescribed dosage of medication, we do not feel her actions in doing so evidence an indifferent or neglectful attitude towards the children's medical care. Although ill-advised, the mother's decision to reduce the child's dosage was made with the child's well-being in mind. Thus, while we strongly admonish the mother to refrain from adjusting the children's prescribed dosages of medication without first consulting their treating physician, we find no error in the family court's determination the incident does not warrant a change of custody.

Moreover, our reading of the record does not convince us the mother has intentionally failed to provide the children with adequate amounts of medication during visitation with the father. Rather, it appears the parties' difficulties result from a lack of communication and cooperation. While we think the parties should coordinate their efforts to resolve their problems, we do not think the circumstances warrant a change of custody.

## B. Dental Care

The father contends the mother has failed to provide the children with necessary dental care. Specifically, the father refers to the mother's failure to take one of the children to an appointment with the dentist and her refusal to follow the dentist's advice. He claims the children have developed gingivitis and pyorrhea.

The mother acknowledged she missed one of Amanda's dental appointments. However, she explained the father, who made the appointment, informed her he made the appointment but did not notify her of the time and did not confirm it with her. Moreover, the mother admitted that despite the advice of the child's regular dentist, she did not want Tabitha's tooth pulled. She explained two of the child's "baby" teeth had already been removed. Although the mother did not allow the children's regular dentist to pull Tabitha's tooth, she did not withdraw the children from the dentist's care. At trial, she

explained that she had scheduled appointments for the children with a different dentist concerning their dental care. The father agreed the children's problems with gingivitis and pyorrhea have improved, and the mother testified she supervises their use of the mouthwash recommended by their dentist.

In our view, the record does not evidence an attitude of indifference on the part of the mother regarding the children's dental care. Although she disagrees with some of the dentist's recommendations, she has not withdrawn the children from his care. As well, there is no evidence in the record that the children's dental problems have developed due to any fault or omission on the mother's part.

## C. Exposure of Children to Mother's Illicit Relationships

The mother and Mr. Hardin dated for approximately six weeks in October or November of 1995. During that time, Hardin spent the night at the mother's home while the children were present on numerous occasions. The mother conceded that on two or three occasions, the mother, Hardin, and the children slept in the same bed. On these occasions Hardin slept in a warm up suit. The children did not observe him in any state of undress and no sexual activity occurred in their presence. The mother terminated her relationship with Hardin after her parents confronted her about allowing him to stay in the home overnight.

The father attempted to establish the mother was also involved with George Wharton. After he observed a red sports car parked in the mother's driveway, the father hired a private investigator to conduct surveillance. The private investigator testified he observed the mother's home from 3:00 a.m. to 8:00 a.m. on July 31, 1996. Wharton's car was in the mother's driveway during the surveillance, but the investigator did not observe any people. The mother admitted she dated Wharton for a time, but denied he ever spent the night at her home. She stated Wharton had two cars, one of which he left in her driveway for safekeeping when he moved to another state. The Father's private investigator confirmed that Wharton had in fact moved out of state.

The father offered evidence of the mother's involvement with a man named "Tony." The private investigator conducted surveillance on the mother's home on September 5 and 6, 1996, in an attempt to gather evidence of Tony's presence at the home. The investigator observed a black car in the mother's driveway at 5:00 p.m. and again at 3:00 a.m. At 6:17 a.m., he saw a man come out of the mother's home and leave in the car. Although he confirmed the mother was in the home by telephoning her, the private investigator did not see the children at the home. The mother admitted she dated Tony for a time, but denied he ever spent the night in her home with the children present.

The family court noted: "although [the mother] exposed the children to her relationship with Mr. Hardin, that relationship ended and no such conduct occurred for over one year prior to trial." The morality of a parent is a proper consideration in determining child custody but it is limited in its force to what relevancy it has, either directly or indirectly, to the welfare of the child. *Marshall v. Marshall*, 282 S.C. 534, 540–41, 320 S.E.2d 44, 48 (Ct.App.1984); *see also Clear v. Clear*, 331 S.C. 186, 500 S.E.2d 790 (Ct.App.1998). We defer to the family court on this credibility issue. Irrefutably, the mother's conduct in allowing the parties' two daughters to sleep in the same bed as the mother and a man to whom she is not married demonstrates *poor parental judgment*. We admonish and strongly discourage the mother from exposing the children to her relationships in this manner.

### D. Mother's Work Schedule and Child Care Arrangements

The father maintains the family court should have ordered a change of custody based on his ability to provide the children a structured and consistent routine. He specifically directs our attention to testimony by the children's neurologist that the children need an established routine inasmuch as fatigue, missing meals, and stress can trigger seizures. We find no error.

The mother's employment at Guardian Industries requires her to work a twelve-hour rotating shift. She either works from 7:00 a.m. until 7:00 p.m., or from 7:00 p.m. to 7:00 a.m.

She rotates from the day shift to the night shift every two weeks on a set scheduled.

The children's maternal grandmother cares for them while the mother works. If the mother works during the day, she delivers the children to the grandmother's home at 6:20 a.m., where they get in bed with the grandmother until they arise and dress for school. The grandmother then tâkes the children to school and picks them up in the afternoon. When the mother works at night, she delivers the children to the grandmother at 6:30 p.m. and they spend the night at the grandmother's home. The children go to bed by 9:00 p.m. and sleep together in a downstairs bedroom during overnight stays with the grandmother. The grandmother helps the children dress and helps them with breakfast. The mother arrives at 7:30 a.m. and takes the children to school.

At the time of trial, the father worked from 8:30 a.m. until 4:15 p.m. or, if overtime was required, until 8:00 p.m.[1] The father's wife arrives home between 5:30 p.m. and 5:45 p.m. each day. The father's stepchildren attend a daycare facility. His wife explained in the event custody of the children was awarded the father, they would be cared for by a third party for part of the day.

The mother's employment provides her with a $2,604.67 monthly income. Although she rotates shifts, her schedule is fixed and can be anticipated. The maternal grandmother and grandfather live next door to the mother. Our reading of the record convinces us the grandmother provides the children with exemplary care during the time the mother works.

Although the mother's work schedule is atypical, we agree with the family court's determination the mother's childcare arrangements are appropriate and provide the children with the benefit of being cared for by family members. The record is devoid of evidence indicating the children have experienced any major difficulties in adjusting to their daily schedules. Specifically, there is no evidence the children 1) experience fatigue or stress, 2) miss meals, or 3) fail to get the proper amount of rest due to their daily schedules. We hold neither

---

1. According to his post-trial motion for reconsideration, the father now works for twelve hours on Friday night and twelve hours on Saturday night, and is free during the remainder of the week.

the mother's work schedule, nor her child care arrangement, constitute a change of circumstances warranting a change of custody.

## E. Children's Education

The father avers the mother has failed to cooperate with him in registering the children for school, has failed to share relevant school information, and has caused the children to miss or limit their participation in extracurricular activities. We disagree with the father's characterization of the mother's behavior.

Although the parties experienced a degree of difficulty in registering the children for school, the testimony at trial reveals the difficulties were the result of schedule conflicts between the mother and father and confusion as to the location and sufficiency of the children's birth certificates and inoculation records. To lay all blame for the delay in registering the children at the mother's feet is to distort the circumstances as evidenced by the record.

The father testified on one occasion the mother failed to tell him to take one of the children to school early so that she could attend a field trip. We believe the mother's failure in this regard was an isolated incident of oversight. He professes the children have either missed or had their participation limited in extracurricular activities due to the actions of the mother. Specifically, he cites testimony indicating the mother attended only a few of the children's T-ball games, the children missed practice while in the mother's care, and the mother took little initiative in getting the children involved in extracurricular activities. The mother stated she attended T-ball games when her work schedule permitted her to do so, that the children missed practice only due to illness, and that the children simply declined to participate in certain extracurricular activities. In addition, the mother testified she attends PTA meetings, makes cupcakes for the children's classes, goes on field trips, makes crafts for their teachers, and maintains calendars with notations of their activities.

The mother has not displayed disinterest in the children's educational or extracurricular activities. To the contrary, the evidence suggests she is quite active in the children's school.

The mother appears active in the children's extracurricular activities to the extent possible given her work schedule.

The father asserts the family court's order should be reversed and custody of the children awarded to him due to the family court's finding: "no evidence was presented that Tabitha is in danger of academic failure." He contends this finding is erroneous in light of the following statement contained in the neurologist's report: "Per the teacher questionnaire Tabitha is not working on grade level ... She may need to repeat first grade next year."

Assuming the statement contained in the neurologist's report constitutes evidence that Tabitha was indeed in danger of academic failure, we decline to reverse the family court's order on this ground. Although there is evidence Tabitha experiences some difficulty in school, nothing in the record convinces us the difficulties she experiences are due to any act or omission on the part of the mother. Any error the family court committed in this regard does not constitute reason to disturb the court's determination of custody.

The father has expressed concern at the number of tardies and absences listed in the children's attendance records. Amanda had thirteen tardies for the period of August 1995 to March 1996. Only one of those tardies was excused for medical reasons, the others were listed as unlawful. Tabitha had only one tardy, which was unlawful, during the same period. However, she was absent on eleven occasions, and four were unexcused. The father opines this behavior evidences a lack of a stable and predictable routine, likely caused by the mother's shifting schedule. We have concernment in regards to this school attendance deficiency, but conclude the mother has instituted curative actions.

### F. Consideration of Mother's Occupancy of Former Marital Home

In determining custody should remain with the mother, the family court reasoned, in part:

The [mother] and the children reside in the former marital home. The children have lived there all their lives. No one other than the [mother] and children live in this home. The home is spacious and each child has her own bedroom. The

home is in good condition. Several witnesses testified that the [mother] is an impeccable housekeeper and always maintains a clean and orderly home. The [mother] also works in her yard and keeps it in good condition.

. . . .

The children continue to reside in the home they have lived in all their lives, and that home is appropriate for the children.

The father argues the family court erred in placing significant emphasis on the mother's occupation of the former marital home. He maintains such reliance was misplaced "given the [mother's] history of failing to pay insurance premiums and mortgage payments" and because the mother "lied under oath with regard to the mortgage payments owing on the former marital home." [2]

The falsity of the mother's testimony is not, standing alone, sufficient reason to overturn the family court's decision as to custody. Although the father alleged in his post-trial motion he was served with pleadings in a foreclosure action on the former martial home, he produced no documentation that the foreclosure action was prosecuted to its conclusion or that the mother and children have been displaced from the home. Moreover, the father presented no evidence to contradict the mother's testimony that although she allowed her homeowner's insurance to lapse for a short period of time, no pecuniary or property loss occurred as a result of the lapse and she had obtained coverage with a different company by the time of trial. The family court's consideration of the wife's occupancy of the former marital home was but one factor among many the family court considered in making its custody determination. We decline to reverse the family court's decision on this basis.

## II. Role of the Guardian ad Litem

 The guardian ad litem filed a separate brief in which she raised questions regarding the weight a trial judge should

---

2. At trial, the mother testified the mortgage payments on the home were current as of April 1997. The complaint in the foreclosure action alleged payment on the mortgage had not been made since February of 1997.

place on the guardian's recommendation. She argues the recommendation should be given substantial weight and should not be rejected without stating on the record or in the order the reasons for rejecting that recommendation.

The trial court addressed the concerns raised by the guardian in her report and at trial. Her main concerns centered on the relationship the mother had with Mr. Hardin and on the mother's reduction of Tabitha's medication. The trial court noted:

> The Guardian ad Litem described the children as bright and beautiful young girls who love both parents. The Guardian ad Litem recommended that the parties be granted joint custody of the children and that the children reside with the [father] during the school year and with the [mother] during the summer months. Her recommendation is based upon two primary concerns. The first is the [mother's] prior relationship with Mr. Hardin. The Guardian ad Litem believes the [mother] exercised poor judgment in having Mr. Hardin overnight in her home in the presence of the children. The Guardian ad Litem's second major concern is the children's medical condition. She also believes the [mother] exercised poor judgment by reducing the dosage of Tabitha's Tegretol. Dr. Shaw testified that the children need structure in their lives to minimize the adverse consequences of their epilepsy. The Guardian ad Litem feels such structure will exist if her recommendation is followed by this court.

The role of the guardian ad litem in making custody recommendations is to aid, not direct, the court. Ultimately, the custody decision lies with the trial judge. *Clear v. Clear*, 331 S.C. 186, 191, 500 S.E.2d 790, 792 (Ct.App.1998); *see Shainwald v. Shainwald*, 302 S.C. 453, 395 S.E.2d 441 (Ct. App.1990). This court in *Shainwald* explicated:

> We think much of the criticism of guardians ad litem stems from the failure of the bar to recognize the proper function of a guardian ad litem. A guardian ad litem is a representative of the court appointed to assist it in properly protecting the interests of an incompetent person. *Dawson v. Garcia*, 666 S.W.2d 254 (Tex.App.1984); *Clarke v. Chicago Title & Trust Co.*, 393 Ill. 419, 66 N.E.2d 378 (1946); *In*

*re Hallstead's Estate,* 338 Pa. 257, 12 A.2d 912 (1940); *see Blackwell v. Vance Trucking Co.,* 139 F.Supp. 103 (D.C.S.C. 1956). A statement made by the court in *Bahr v. Galonski,* 80 Wis.2d 72, 83, 257 N.W.2d 869, 874 (1977), is instructive:

> The requirement that the children have independent legal representation does not in any way suggest that the parents or the trial court were unmindful of the children's welfare. Rather, it reflects the conviction that the children are best served by the presence of a vigorous advocate free to investigate, consult with them at length, marshal evidence, and to subpoena and cross-examine witnesses. The judge cannot play this role. Properly understood, therefore, the guardian ad litem does not usurp the judge's function; he aids it.

We hold the extent to which a guardian ad litem is permitted to testify and give an opinion or recommendation in a child custody case is left to the sound discretion of the trial judge. However, judges should be mindful of the duty of the guardian ad litem to advocate and fully protect the interests of his ward.

*Shainwald v. Shainwald,* 302 S.C. 453, 457, 395 S.E.2d 441, 444 (Ct.App.1990)

The family court judge adequately recognized the concerns of the guardian and came to a different conclusion. Based on our review of the record, the judge gave proper weight and consideration to the recommendation delivered by the guardian ad litem and did not abuse his discretion in refusing to follow the recommendation.

### III. Attorney's and Guardian Ad Litem's Fees

The father claims the family court erred in ordering him to pay the mother's attorney's fees because the mother did not request such relief in her pleadings. We hold the issue of attorney's fees was tried by consent inasmuch as the father consented to a request by the mother's attorney, made at the conclusion of the trial, that both parties be allowed to submit attorney's fee affidavits. *See McCurry v. Keith,* 325 S.C. 441, 447, 481 S.E.2d 166, 169 (Ct.App.1997) ("When issues not raised in the pleadings are tried by consent, they will be treated as if they had been raised in the pleadings."); *see also* Rule 15(b), SCRCP ("When issues not raised by the pleadings

are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings . . . [and] failure so to amend does not effect the result of the trial of these issues.").

The father also contends the family court failed to give proper consideration to the factors relevant to awarding the wife $2,235.00 in attorney's fees. We disagree.

An award of attorney's fees will not be overturned absent an abuse of discretion. *Stevenson v. Stevenson,* 295 S.C. 412, 415, 368 S.E.2d 901, 903 (1988). In awarding attorney's fees, the court should consider the parties' ability to pay their own fee, the beneficial results obtained by the attorney, the parties' respective financial conditions, and the effect of the fee on each party's standard of living. *E.D.M. v. T.A.M.,* 307 S.C. 471, 476-77, 415 S.E.2d 812, 816 (1992). In determining the amount of attorney's fees to award, the court should consider the nature, extent, and difficulty of the services rendered, the time necessarily devoted to the case, counsel's professional standing, the contingency of compensation, the beneficial results obtained, and the customary legal fees for similar services. *Glasscock v. Glasscock,* 304 S.C. 158, 161, 403 S.E.2d 313, 315 (1991).

We have reviewed the award of attorney's fees in light of the applicable factors. Under the facts and circumstances of this case, particularly the mother's successful defense of the action and the father's superior income, we find no abuse of discretion in the award.

Father also contends the family court abused its discretion in ordering him to pay the entire balance of $813.25 for guardian ad litem fees. We agree.

An award of guardian ad litem fees lies within the sound discretion of the trial judge and will not be disturbed on appeal absent an abuse of discretion. *Nash v. Byrd,* 298 S.C. 530, 381 S.E.2d 913 (Ct.App.1989). Although the mother ultimately obtained beneficial results in this action, this is only one factor we consider when allocating an award of guardian ad litem fees. In the present case, the father had legitimate reasons for bringing this action. His genuine concern for his daughters' welfare necessitated the appointment of a guard-

ian. Furthermore, the recommendations of the guardian ad litem supported a change in custody to the father. Therefore, we find the family court abused its discretion in determining the father should pay the entire amount of guardian ad litem fees. We conclude the father and the mother should bear an equal burden in the assessment of guardian ad litem fees and thus modify the family court order to allocate fifty per cent of the guardian ad litem fees against each party.

## CONCLUSION

We hold there are no changes in the circumstances of the parties sufficient to warrant a change in the custody of the children. We do find cause for concern in some of the actions of the mother, but we feel these are not illustrative of a continuing pattern of disinterest or neglect of her children. We rule the family court judge properly considered the concerns of the guardian ad litem, and find no abuse of discretion in refusing to follow her recommendation. We conclude the award of attorney's fees to the mother was appropriate and not an abuse of discretion. However, we determine the father and the mother should each bear an equal burden of the guardian ad litem fees. For the foregoing reasons, the decision of the family court is

**AFFIRMED AS MODIFIED.**

HEARN, C.J., and HUFF, J., concur.