# THE STATE OF SOUTH CAROLINA
## In The Court of Appeals

Wendy Grungo-Smith, Respondent,

v.

Joseph Grungo, Appellant.

Appellate Case No. 2020-000934

———————

Appeal From York County
Thomas Henry White, IV, Family Court Judge

———————

Opinion No. 5969
Heard November 16, 2022 – Filed February 10, 2023

———————

## REVERSED

———————

John Brandt Rucker and Allyson Sue Rucker, both of
The Rucker Law Firm, LLC, of Greenville, for
Appellant.

James R. Honeycutt, of Fort Mill, and James B.
Richardson, Jr., of Columbia, both for Respondent.

———————

**LOCKEMY, A.J.:** Wendy Grungo-Smith (Mother) appeals an order from the
family court awarding primary custody of Child 1 and Child 2 (collectively,
Children) to Joseph Grungo (Father) and granting an award of child support to
Father. We reverse.

**FACTS/PROCEDURAL HISTORY**

In 2012, Mother and Father divorced. Pursuant to a court-approved agreement, the

parties were to share joint custody of Children; specifically, a 5-2-2-5 schedule. The divorce decree provided, among other things, that (1) if one parent had Children for more than fifty percent of the time, the other parent would "contribute to the support and maintenance of Children"; (2) Children would be enrolled in any private school agreed to by each party; and (3) each party would abstain from using profanity or making derogatory comments about the other party and ensure others would not make such comments in Children's presence.

In March 2019, Mother filed a custody modification action, asserting Father failed to "take advantage of shared visitation." She sought sole custody of Children, standard visitation for Father, and child support. Father filed an answer and counterclaim seeking essentially the same relief in his favor and alleging numerous changes in circumstances.

At the June 2020 trial, Mother testified Children were eleven and twelve years old. Mother testified she had two jobs and worked during weekdays, every other weekend, and at night, from home, after Children went to sleep. She explained Father never exercised his full custody time, even though she and her husband, Kenneth Smith (Stepfather) did not prevent him from doing so. Mother stated she had moved five or six times since the parties' divorce and each move was to a larger home or closer to Children's school. Mother testified she moved into her current home, which was twenty minutes or twenty-two miles from Father, shortly before trial and was required to live there for fifteen years as a condition of her loan. She stated her current home was closer to Father than her previous home, and the longest Father ever had to travel to her home was thirty-five minutes, assuming there was no traffic. Mother testified Children behaved well and excelled physically, mentally, socially, and academically. Mother indicated Stepfather was a father figure to them, and neither she nor Stepfather spoke badly of Father to Children or discouraged their relationship with him. She stated that although she and Stepfather argued like normal married people, they discussed their issues outside Children's presence.

Stepfather testified Mother was Children's primary caretaker, and neither he nor Mother discouraged Children from having a relationship with Father. He stated although no one prevented it, Father never utilized all of his allotted custody time. However, he acknowledged Father recently visited Children more often because they were out of school.

Father testified he had lived in Fort Mill for the past thirteen years and owned his own business. He admitted he occasionally missed Monday and Tuesday overnight visits but explained he usually took Children to dinner on those nights.

He testified he did not exercise his full custody time because of his work schedule and traffic. Father testified he provided only $1,200 to Mother during the year prior to trial. Father acknowledged he could have taken Children to school earlier or modified his work hours and further acknowledged that neither Mother nor Stepfather prevented him from exercising his custody time. He averred Mother's moves had a negative effect on his ability to spend time with Children because of his commute to pick up Children and drop them off at school. Accordingly, he requested primary custody of Children so they could go to school in Fort Mill.

On cross-examination, Father credited Mother for Children's academic success. He admitted the divorce decree did not prevent either party from moving and it required the parties to share Children's expenses equally. Father also admitted he never tried to legally enforce the school provision.

Several additional witnesses testified about Mother, Father, and Children. Gwen Catron, Children's maternal grandmother, testified Mother was a loving mother, Stepfather was a good father-figure, and Father was a good dad. John Willfong, a former administrator from Children's school, testified he believed Children excelled academically due, in part, to Mother's involvement in their education.

The guardian ad litem (Guardian), testified she conducted five in-person visits with Children and spoke to them five or six additional times on the phone, with the last occurring on the day of trial. She testified she was welcomed at Mother's and Father's homes, and both parties were cooperative throughout her investigation. The Guardian stated Children indicated Mother and Stepfather yelled and fought a lot in front of them and belittled Father to them. The Guardian testified Children told her Mother put oil on their heads to "be blessed" before they spoke to her and so they would not say anything negative about her to the Guardian. She stated that at Mother's home, Children were "much more uptight," appeared "very nervous," whispered to her so no one would overhear them, and requested to go to their bedrooms for the visits. She also stated that during one visit, Child 1 showed her videos of Mother and Stepfather arguing. The Guardian testified that at Father's home, Father let her speak to Children privately and Children appeared very relaxed. She stated Children loved both parents, did not want to be torn between the situation, and were credible. The court requested the Guardian provide a recommendation because "of the disparity in the testimony before [it] today" and that neither party provided "a middle ground." Upon the court's request, the Guardian stated she believed Father would be the better suited custodial parent based on the information provided by Children.

In her written report, the Guardian stated Children were happy, well-mannered

children and were always willing to speak with her, regardless of whether they were at Mother's home or Father's. However, she stated they told her they felt comfortable at Father's home and liked his home better because there was "so much peace" and no "stress." She indicated Children told her that at Mother's house, they performed most of the chores and watched their sibling and other children Mother babysat. The Guardian also reported Mother gave her videos of visitation exchanges, which showed Mother telling Father not to come close to her car and Children appearing stressed. She stated she had not found any reason to believe Father was a threat to Mother.

The family court found Father showed a material change in circumstances to warrant a change of custody and such change was in Children's best interests. It stated Father admittedly did not exercise his full custody time. However, it found the parties initially lived twenty to thirty minutes of each other but after Mother's changes in residences, Father's home was forty-five minutes to an hour away. It found Children had changed schools six times and a daily commute for Father rendered the parenting plan "extraordinarily" difficult. The court determined Mother did not consult with Father about any of her moves or obtain Father's agreement before selecting Children's schools and concluded Mother's moves and Children's schools were not conducive to the 5-2-2-5 parenting plan.

The family court found although Mother and Stepfather denied it, Children told the Guardian that Mother and Stepfather argued in front of them and called Father disparaging names, which impeached Mother's and Stepfather's credibility and lent credence to Father's allegations. It acknowledged Children told the Guardian they loved both parents; however, it found Children also told the Guardian they liked Father's home better because there was "so much peace" and no arguing or stress. The family court determined Children showed the Guardian videos of Mother and Stepfather arguing and told the Guardian they could not speak to her on the phone because they were at Mother's home. It further noted the Guardian recommended Father be granted custody. Accordingly, the family court granted Father's request for sole custody and awarded him child support. This appeal follows.

**ISSUE ON APPEAL**

Did the family court err in awarding custody of Children to Father?

**STANDARD OF REVIEW**

"In family court appeals, this court reviews factual and legal issues de novo." *Whitesell v. Whitesell*, 431 S.C. 575, 584, 848 S.E.2d 588, 592 (Ct. App. 2020).

"Although this court reviews the family court's findings de novo, we are not required to ignore the fact that the family court, which saw and heard the witnesses, was in a better position to evaluate their credibility and assign comparative weight to their testimony." *Id.*

## LAW/ANALYSIS

Mother argues the family court erred in awarding custody of Children to Father. She asserts the evidence showed Children were thriving in her care and all parties agreed Children were exceptional. We agree.

"The paramount and controlling factor in every custody dispute is the best interests of the children." *Brown v. Brown*, 362 S.C. 85, 90, 606 S.E.2d 785, 788 (Ct. App. 2004). In modifying a custody order, the family court must consider the children's best interests and other statutory factors. S.C. Code Ann. § 63-15-240(B) (Supp. 2022).

"In order for a court to grant a change in custody, there must be a showing of changed circumstances occurring subsequent to the entry of the [custody order]." *Latimer v. Farmer*, 360 S.C. 375, 381, 602 S.E.2d 32, 35 (2004). "A change in circumstances justifying a change in the custody of a child simply means that sufficient facts have been shown to warrant the conclusion that the best interests of the children would be served by the change." *Id.* (quoting *Stutz v. Funderburk*, 272 S.C. 273, 278, 252 S.E.2d 32, 34 (1979)). "[T]he change of circumstance relied on for a change of custody must be such as would substantially affect the interest and the welfare of the child, not merely the parties, their wishes or convenience." *Shirley v. Shirley*, 342 S.C. 324, 330, 536 S.E.2d 427, 430 (Ct. App. 2000) (quoting *Sharpe v. Sharpe*, 256 S.C. 517, 521, 183 S.E.2d 325, 327 (1971)).

We hold the family court erred in awarding Father custody because Father did not establish a substantial change in circumstances. First, we find the record did not show a change in circumstances sufficient to modify the custody order. During trial, Father admitted, among other things, that: he failed to take advantage of his shared visitation blaming his failure on his work schedule and traffic; he never had Children in his care for more than fifty percent of the time and failed to provide for them financially pursuant to the joint custody agreement; he did not take Children to school because it interfered with his work schedule, yet acknowledged he could have taken Children to school earlier or modified his work hours; neither Mother nor Stepfather prevented him from exercising his custody time and he praised Children's academic success and credited Mother for it; and the divorce decree did not prevent either party from moving, he never tried to enforce the school

provision, and the divorce decree required the parties to share Children's expenses equally.

On the other hand, the evidence and testimony demonstrate that Children behaved well and excelled physically, mentally, socially, and academically while under Mother's predominant care while she worked two jobs, working during the weekdays, every other weekend, and remotely at night after Children went to sleep. She moved five or six times to a larger home or closer to Children's school. Several witnesses, including Children's former school administrator, testified Children were well-adjusted, great kids, Mother was a good mom, and Children's academic success was due in part to Mother's involvement in their education. *See* § 63-15-240(B)(1-2), (10-11) (stating that when modifying a custody order, the court should consider "the temperament and developmental needs of the child;" "the capacity and the disposition of the parents to understand and meet the needs of the child;" "the child's adjustment to his or her home, school, and community environments;" and "the stability of the child's existing and proposed residences").

Second, we find the family court erred in concluding Mother's moves and Children's schooling arrangements were not conducive to the parenting plan because she did not consult Father. Rather, we find each move was in the best interests of Children. *See* § 63-15-240(B). Mother testified she moved into a larger home each time or was closer to Children's school and that she was required to live in her current residence for fifteen years as a condition of her loan.

Further, we conclude the family court erred by finding that the moves and changes in schools were not conducive to the current parenting plan because the record did not support such a finding. Rather, the 5-2-2-5 plan was not in practice because Father did not exercise his full custody rights and Mother had custody of Children more than fifty percent of the time. Additionally, though the divorce decree provided that if one parent had Children for more than fifty percent of the time, the other parent would "contribute to the support and maintenance of Children," Father testified that for the year prior to trial, he only contributed $1,200 while Children were in Mother's care.

We express our concern with the family court requesting a recommendation from the Guardian because it should have only requested a recommendation in extraordinary circumstances, which were not present in this case. We are also concerned with the family court's heavy reliance on the Guardian's report and testimony in its findings because a family court should determine the best interests of Children after considering all the evidence presented at trial. *See Pirayesh* v. *Pirayesh*, 359 S.C. 284, 296, 596 S.E.2d 505, 512 (Ct. App. 2004) ("Rather than

merely adopting the recommendation of the guardian, the court, by its own review of all the evidence, should consider the character, fitness, attitude, and inclinations on the part of each parent as they impact the child as well as all psychological, physical, environmental, spiritual, educational, medical, family, emotional and recreational aspects of the child's life."); *Shirley*, 342 S.C. at 339, 536 S.E.2d at 435 ("The role of the [Guardian] in making custody recommendations is to aid, not direct, the court. Ultimately, the custody decision lies with the trial judge."). At oral arguments, Father's counsel only pointed to the family court's determination that the 5-2-2-5 plan was rendered difficult to follow, but was unable to identify any other findings in the family court's order establishing a change in circumstances favoring Father that derived from something other than the Guardian's testimony and report.

Father did not present evidence of a substantial change in circumstances. Under Mother's care, Children were well-mannered and excelled academically and socially. Additionally, any changes did not adversely affect Children's well-being and no issues were reported as to their welfare. *See Latimer*, 360 S.C. at 381, 602 S.E.2d at 35 ("The change of circumstances relied on for a change of custody must be such as would substantially affect the interest and welfare of the child."). However, this appeal derives from Mother's custody modification action and Father's counterclaim. As such, both Mother and Father were required to show sufficient facts demonstrating a substantial change in circumstances warranting a change of custody in the best interest of Children. *Id*.

While the testimony and evidence demonstrate that Children excelled under Mother's predominant care, it also demonstrates that Father was a factor in this success and a positive influence. Witnesses testified that Father was a good dad and saw Children at least once or twice a week; he took Children to dinner and spent time with them every other weekend; he demonstrated proactive effort to spend time with Children and participate in their lives; he withheld any disparaging remarks about Mother or Stepfather; and evidence from the Guardian indicated Father created a peaceful atmosphere where Children felt comfortable.

Therefore, based upon the ample evidence demonstrating Children's emotional, social, and academic success under the original joint custody agreement, both parties failed to demonstrate a substantial change in circumstances or that the best interests of Children would be served by a change in custody. Accordingly, we reverse the family court.

**REVERSED.**

**WILLIAMS, C.J., and THOMAS, J., concurs.**