# THE STATE OF SOUTH CAROLINA
## In The Court of Appeals

Catherine Crosby Gandy, Respondent,

v.

John Wilson Gandy, Jr., Appellant.

Appellate Case No. 2022-001812

---

Appeal From Horry County
FitzLee H. McEachin, Family Court Judge

---

Opinion No. 6048
Heard September 12, 2023 – Filed January 24, 2024

---

## AFFIRMED IN PART AND REVERSED IN PART

---

Carolyn R. Hills and Jennifer Darrow Hills, both of Hills
& Hills, PC, of Myrtle Beach; and Rebecca Brown West,
of Harling & West, LLC, of Lexington, all for Appellant.

George M. Hearn, Jr. and Kathleen Wrenn Hearn, both of
Hearn & Hearn, PA, of Conway; and Marie-Louise
Ramsdale, of Ramsdale Law Firm, of Mount Pleasant, all
for Respondent.

Russell W. Hall, III, of The Law Office of Russell W.
Hall III, of Myrtle Beach, as the Guardian ad Litem for
Appellant.

---

**WILLIAMS, C.J.:** In this domestic matter, John W. Gandy, Jr. (Father) appeals
an order of the family court, arguing the family court erred in (1) awarding

Catherine C. Gandy (Mother) primary custody of the parties' children and (2) awarding Mother alimony.  We affirm in part and reverse in part.

**FACTS/PROCEDURAL HISTORY**

Father and Mother married on June 12, 2010, in Horry County.  During their marriage, the parties had four children together.  The parties separated on October 20, 2020, and lived separate and apart since the date of separation.

On October 6, 2020, Mother filed an action seeking separate support and maintenance, sole custody, child support, and alimony, among other relief.  Father answered and counterclaimed, seeking separate support and maintenance, joint custody, child support, and other various relief.  Mother later amended her complaint, seeking a divorce on the ground of one year's continuous separation and the right to relocate with the children to New Orleans, Louisiana.  Father answered and counterclaimed, also seeking a divorce on the ground of one year's continuous separation and sole custody of the children.

By consent of the parties, the family court issued a temporary order on April 15, 2021, granting joint custody in which Mother had primary physical and legal custody and Father had visitation every other weekend and overnight on Thursdays during the off weeks.[1]  The temporary order also directed Father to pay Mother $6,000 per month in unallocated support.  In November 2021, the parties consented to a custody evaluation.

The family court held a two-week hearing in July 2022.  On September 26, 2022, the family court issued a final order and decree of divorce.  Both parties subsequently filed motions pursuant to Rule 59(e), SCRCP.  Following a hearing on the motions, the family court issued an amended final order and decree of divorce on December 19, 2022, granting, among other relief, a divorce on the ground of one year's continuous separation; awarding the parties joint custody of the children, with Mother having primary physical and legal custody; granting Mother's request to relocate to New Orleans, Louisiana; and awarding Mother rehabilitative alimony, which Father was required to secure with a life insurance policy.[2]  This appeal followed.

---

[1] Mother and the children were to reside in the marital home during litigation.
[2] The family court also issued two orders partially granting each party's post-trial motion.

**ISSUES ON APPEAL**

I.   Did the family court err in awarding Mother primary custody of the children?

II.  Did the family court err in awarding Mother rehabilitative alimony?

**STANDARD OF REVIEW**

On appeal from the family court, this court reviews factual and legal issues de novo, with the exceptions of evidentiary and procedural rulings. *Stone v. Thompson*, 428 S.C. 79, 91, 833 S.E.2d 266, 272 (2019); *see also Stoney v. Stoney*, 422 S.C. 593, 596, 813 S.E.2d 486, 487 (2018) (per curiam). Therefore, this court may find facts in accordance with its own view of the preponderance of the evidence. *Posner v. Posner*, 383 S.C. 26, 31, 677 S.E.2d 616, 619 (Ct. App. 2009). However, this broad scope of review does not prevent this court from recognizing the family court's superior position to evaluate witness credibility and assign comparative weight to testimony. *Lewis v. Lewis*, 392 S.C. 381, 392, 709 S.E.2d 650, 655 (2011). Moreover, the appellant maintains the burden of convincing the appellate court that the family court's findings were made in error or were unsubstantiated by the evidence. *Posner*, 383 S.C. at 31, 677 S.E.2d at 619.

**LAW/ANALYSIS**

**I.    CUSTODY**

   **A.     Award of Primary Custody to Mother**

Father argues the family court erred in awarding primary custody of the children to Mother. Specifically, he contends the family court inaccurately assessed Mother's fitness and overvalued the primary caretaker factor because he contributed substantially to the children's care. Additionally, Father avers the family court assigned little weight to Mother's shortcomings as a parent and her attempts at alienating the two oldest children.

"The paramount and controlling factor in every custody dispute is the best interests of the children." *Brown v. Brown*, 362 S.C. 85, 90, 606 S.E.2d 785, 788 (Ct. App. 2004). "While numerous prior decisions set forth criteria that are helpful in such a determination, there exist no hard and fast rules and the totality of circumstances peculiar to each case constitutes the only scale upon which the ultimate decision can be weighed." *Klein v. Barrett*, 427 S.C. 74, 81, 828 S.E.2d 773, 776 (Ct. App.

2019) (quoting *Clark v. Clark*, 423 S.C. 596, 605, 815 S.E.2d 772, 777 (Ct. App. 2018)).

"In reaching a determination as to custody, the family court should consider how the custody decision will impact all areas of the child's life, including physical, psychological, spiritual, educational, familial, emotional, and recreational aspects." *Shirley v. Shirley*, 342 S.C. 324, 330, 536 S.E.2d 427, 430 (Ct. App. 2000). "Additionally, the court must assess each party's character, fitness, and attitude as they impact the child." *Id.* "The relative fitness of parents is an important issue in custody litigation . . . . Fitness decisions normally turn on either of two considerations; whether either parent has been the primary caretaker, or whether either parent has engaged in conduct which would affect the welfare of the child." *Brown*, 362 S.C. at 91, 606 S.E.2d at 788 (quoting Roy T. Stuckey, *Marital Litigation in South Carolina* 433 (3rd ed. 2001) (internal citations omitted)).

In its amended final order, the family court found that due to "Mother's role as primary caregiver, . . . it [was] appropriate for her to be designated as the primary custodial parent." In support of this finding, the family court stated, "Mother nor Father have shown any failures in their ability as parents[; however,] . . . Father's alcohol use is of some concern to the Court . . . ." The court noted:

> The Court is also concerned with Father's disciplinary style and issues with anger. The Court notes Father's disclosure to his counselor that he was seeking counseling for "anger issues." Jennifer Poindexter, the older two children's therapist, testified that a majority of the sessions with the two oldest children (which took place over the duration of this case) were spent addressing Father's disciplinary style used with them. Though Ms. Poindexter also pointed out that both children indicated that Father has gotten better about yelling at them. The younger two children's therapist also testified that Father placed the younger son outside as punishment, which caused distress to the child for some period of time thereafter. The evidence, including testimony from the children's therapists, reveals that Mother better adapts her disciplinary style to what each child needs, without being inappropriately permissive.

However, the final order also addressed concerns the family court had with Mother, particularly her "efforts to alienate Father" from the oldest daughter. Nonetheless, it stood by its decision to award Mother primary custody, finding it did "not believe the efforts of Mother were necessarily intended to destroy the relationship with Father and the children . . . ."

We hold the family court's grant of primary custody to Mother serves the best interest of the children. *See Stone*, 428 S.C. at 91–92, 833 S.E.2d at 272 (stating that on appeal from the family court, this court reviews factual and legal issues de novo with the exceptions of evidentiary and procedural rulings); *Brown*, 362 S.C. at 90, 606 S.E.2d at 788 ("The paramount and controlling factor in every custody dispute is the best interests of the children."). Father asserts the family court inaccurately assessed Mother's fitness and overvalued the primary caretaker factor; we disagree. Our review of the record indicates Mother is more attuned to the children's emotional needs and disciplines the children more effectively. *See Shirley*, 342 S.C. at 330, 536 S.E.2d at 430 ("In reaching a determination as to custody, the family court should consider how the custody decision will impact all areas of the child's life, including physical, psychological, spiritual, educational, familial, emotional, and recreational aspects."); *id.* ("Additionally, the court must assess each party's character, fitness, and attitude as they impact the child."); *Brown*, 362 S.C. at 91, 606 S.E.2d at 788 ("Fitness decisions normally turn on either of two considerations; whether either parent has been the primary caretaker, or whether either parent has engaged in conduct which would affect the welfare of the child." (quoting Roy T. Stuckey, Marital Litigation in South Carolina 433)). Dr. Poindexter, therapist for the oldest two children, and Dr. Henderson, the court- appointed custody evaluator, testified Mother disciplines the children more effectively by adapting her style to each child's needs. Additionally, they indicated Mother is more attuned to the emotional needs of each child and the children feel more secure and comfortable confiding in her. To this same point, we agree with the concerns of the family court identified in the record about Father's style of discipline, including two particular incidents involving discipline that are concerning and a troubling history of alcohol use. The Guardian Ad Litem's report stated "the primary reason for the break-up of the marriage was Father's unhealthy relationship with alcohol. . . ." We agree this conduct negatively affects the welfare of the children, thus making Mother the better-suited party to have primary custody of the children.

Father's argument that the family court should have afforded more weight to Mother's attempts at alienating the children and Mother's own shortcomings as a parent fails to persuade us that Mother should not be afforded primary custody.

Our review of the record indicates neither parent was perfect during the course of their separation and this litigation. Father places particular emphasis on Mother's attempts to align his oldest daughter against him and Mother's failure to alternate bringing the children to therapy sessions. Dr. Poindexter testified about Mother's alignment issues and expressed concern about the future of the oldest daughter's relationship with Father should it continue; however, she clarified that Mother was not consciously trying to create a "wedge" between the children and Father and that Mother eventually began alternating who took the children to therapy. Further, Father fails to acknowledge his own faults and conduct during the course of this case. Dr. Poindexter noted that both parents improperly attempted to influence and talk with the children about this case. She stated that Father called Mother a "despicable, controlling woman" in front of the children; repeatedly questioned the children about what occurred at Mother's house, which made them uncomfortable; and told the children he did not want them to move to New Orleans.

Accordingly, we affirm the family court's award of primary custody to Mother. *See Brown*, 362 S.C. at 90, 606 S.E.2d at 788 ("The paramount and controlling factor in every custody dispute is the best interests of the children."); *Shirley*, 342 S.C. at 330, 536 S.E.2d at 430 ("[T]he court must assess each party's character, fitness, and attitude as they impact the child.").

### B. Relocation to Louisiana

Father argues the family court's grant of Mother's request to relocate to Louisiana is not in the best interest of the children. We disagree.

"[A] parent cannot be refused custody simply because he/she intends to take the child to a distant state." *Marshall v. Marshall*, 282 S.C. 534, 541, 320 S.E.2d 44, 49 (Ct. App. 1984). "This is just another factor to be considered by the [family court]." *Id.*

> Cases involving the relocation of a custodial parent with a minor child bring into direct conflict a custodial parent's freedom to move to another state without permission from the court and the noncustodial parent's right to continue his or her relationship with the child as established before the custodial parent's relocation.

*Latimer v. Farmer*, 360 S.C. 375, 380, 602 S.E.2d 32, 34 (2004). "In all child custody cases, including relocation cases, the controlling considerations are the child's welfare and best interests." *Id.* at 381, 602 S.E.2d at 35. "The effect of relocation on the child's best interest is highly fact specific. It should not be assumed that merely relocating and potentially burdening the non-custodial parent's visitation rights always negatively affects the child's best interests." *Id.* at 382, 602 S.E.2d at 35. "Because '[f]orcing a person to live in a particular area encroaches upon the liberty of an individual to live in the place of his or her choice,' the court's authority to prohibit an out-of-state move 'should be exercised sparingly.'" *Rice v. Rice*, 335 S.C. 449, 453–54, 517 S.E.2d 220, 222 (Ct. App. 1999) (quoting *VanName v. VanName*, 308 S.C. 516, 519, 419 S.E.2d 373, 374 (Ct. App. 1992)). "While South Carolina has not delineated criteria for evaluating whether the best interests of the children are served in relocation cases, our Supreme Court has acknowledged, without endorsing or specifically approving, factors other states consider when making this determination." *Walrath v. Pope*, 384 S.C. 101, 106, 681 S.E.2d 602, 605 (Ct. App. 2009) (noting factors considered by New York and Pennsylvania courts).

In its final order, the family court found relocation to New Orleans to be in the children's best interest, stating "[a]ppellate jurisprudence on this issue shows a trend in favor of recognizing the benefits of relocation in a proper case." In making its determination, the court noted:

> [This court] is left with an exceptionally difficult decision to make. All of the experts in this case indicated that it would be better for the children to remain in Horry County with both parents. On the other hand, Mother, as the primary custodial parent, has clearly established that the *Latimer* factors weigh in favor of her being permitted to relocate with the children to New Orleans. As the Court of Appeals stated in *Rice v. Rice*, 335 S.C. 449[, 517 S.E.2d 220] (Ct. App. 1999), "forcing a person to live in a particular area encroaches upon the liberty of an individual to live in the place of his or her choice, the court's authority to prohibit an out-of-state move should be exercised sparingly." Unfortunately, this Court is unaware of any case law since *Latimer* where such a prohibition has been upheld.

The family court acknowledged that "while the children's relocation with Mother will undoubtedly come at the expense of less time with Father and their paternal grandparents, Mother's primary custody of the children is in their overall best interests."  It further noted:

> Father will be able to maintain his relationship with the children through regular weekend and long weekend visits, the majority of school breaks and holidays, and through daily electronic visitation.  Father clearly has the ability, with his parents' professed support, to afford air travel on a regular basis and Mother shall contribute to the travel costs . . . .

Based on our de novo review of the record, we hold the family court did not err in permitting Mother to relocate to New Orleans and that relocation served the best interest of the children.  *See Latimer*, 360 S.C. at 382, 602 S.E.2d at 35 ("In all child custody cases, including relocation cases, the controlling considerations are the child's welfare and best interests."); *id.* at 381, 602 S.E.2d at 35 ("The effect of relocation on the child's best interest is highly fact specific.  It should not be assumed that merely relocating and potentially burdening the non-custodial parent's visitation rights always negatively affects the child's best interests."); *Walrath*, 384 S.C. at 106, 681 S.E.2d at 605 (listing factors this court has acknowledged when determining whether to permit relocation).  Mother testified she was offered a job in New Orleans with an annual salary of $60,000 and full benefits.  She further testified if permitted to relocate, she would live behind her parents in a house rent-free and would have support from family and close friends.  According to Mother, her parents would be able to watch the children daily in New Orleans whereas Mother felt a lack of support from Father's family in Myrtle Beach.  Additionally, she noted her son's pulmonologist in New Orleans would only be five minutes away instead of the current two-and-a-half-hour drive to Charleston from Myrtle Beach.  Mother further testified the children would have to attend different schools in Myrtle Beach whereas they would be able to attend the same school in New Orleans.  Mother estimated the children had already spent ten percent of their lives in New Orleans visiting family and noted all of the children's medical procedures were done there, making any potential transition for the children easier.

In contrast, if required to stay in Myrtle Beach, Mother was uncertain of what, if any, job prospects she would have; she alleged that Father had talked badly about her in the community and Father and his family had not offered any assistance to

aid her in staying in Myrtle Beach.  Moreover, Father confirmed he had done nothing to help Mother find a job.  Ultimately, Mother has no ties to Myrtle Beach outside of her former relationship with Father and his family.  *See Marshall*, 282 S.C. at 541–42, 320 S.E.2d at 49 (granting a mother's request to relocate to Louisiana after awarding her primary custody and finding she "ha[d] no ties to the state of South Carolina other than her now ex-husband's family[,] . . . [her] whole life was in Louisiana[, s]he ha[d] friends and family there who [would] provide the love, support, and attention to the children as would [her ex-husband's family, and t]he best interest of the children [would] be served by allowing [the] mother to relocate in a state where she [would] have the greatest opportunity to build her new life and care for the children").  Based on the foregoing, we find relocation serves the best interest of the children and affirm the family court's holding.  *See Latimer*, 360 S.C. at 382, 602 S.E.2d at 35 ("In all child custody cases, including relocation cases, the controlling considerations are the child's welfare and best interests.").

## II.  REHABILITATIVE ALIMONY

Father contends the family court erred in setting the amount of rehabilitative alimony and the length of the alimony term.  We agree.

"Alimony is a substitute for the support normally incident to the marital relationship."  *Hagood v. Hagood*, 427 S.C. 642, 657, 832 S.E.2d 609, 617 (Ct. App. 2019).  A family court may award alimony as a means of permanent support or for a temporary, rehabilitative term.  *Johnson v. Johnson*, 296 S.C. 289, 300, 372 S.E.2d 107, 113 (Ct. App. 1988).  "The purpose of rehabilitative alimony is to encourage a dependent spouse *to become self-supporting* after a divorce."  *Jenkins v. Jenkins*, 345 S.C. 88, 95, 545 S.E.2d 531, 535 (Ct. App. 2001) (emphasis added).  "It permits former spouses to develop their own lives free from obligations to each other."  *Id.*

> Factors to be considered in making an alimony award include: (1) duration of the marriage; (2) physical and emotional health of the parties; (3) educational background of the parties; (4) employment history and earning potential of the parties; (5) standard of living established during the marriage; (6) current and reasonably anticipated earnings of the parties; (7) current and reasonably anticipated expenses of the parties; (8) marital and nonmarital properties of the parties; (9) custody of children; (10) marital misconduct or fault;

(11) tax consequences; and (12) prior support
obligations; as well as (13) other factors the court
considers relevant.

*Hagood*, 427 S.C. at 658, 832 S.E.2d at 617 (quoting *Allen v. Allen*, 347 S.C. 177,
184, 554 S.E.2d 421, 424 (Ct. App. 2001)); *see also* S.C. Code Ann. § 20-3-130(C)
(2014) (listing factors for the family court to consider when making an alimony
determination). "No one of the above factors is dispositive." *Hagood*, 427 S.C. at
658, 832 S.E.2d at 617. "It is the duty of the family court to make an alimony
award that is fit, equitable, and just if the claim is well founded." *Allen*, 347 S.C.
at 184, 554 S.E.2d at 424.

Based on our de novo review, we find the family court erred in awarding Mother
rehabilitative alimony. *See Stone*, 428 S.C. at 91, 833 S.E.2d at 272 (providing
that on appeal from the family court, this court reviews factual and legal issues de
novo). Here, the parties were married for ten years before their separation. Prior
to the marriage, both parties attended Wofford College. Mother graduated with a
bachelor's degree in business economics. During the marriage, Mother stayed
home with the children while Father worked as an accountant for his family's
accounting firm in Myrtle Beach. At the time of trial, Mother was thirty-five years
old and Father was thirty-seven years old.

At trial, the parties stipulated to the admission of a report by Mother's vocational
rehabilitation expert, George Page. In his assessment, Page stated he conducted a
one-hour telephone interview of Mother in April 2022 to determine her current
employability and wage-earning capacity. His report stated:

> Ms. Gandy's work experience has been fairly short term.
> Her first job after Wofford College was with Coastal
> Direct Marketing Solutions, where she worked for less
> than one year. She was originally hired to assist in the
> organization process of mailings to retailers. She noted
> that she also called on businesses and solicited new
> business. She left because the job did not end up being
> what she expected.

Page also noted Mother worked part-time as a sales clerk for a retail shop in Myrtle
Beach for approximately one year following her employment with the marketing
firm but ceased working there before the birth of the parties' first child. For the
next ten years, Mother stayed home with the children. After considering Mother's

employment history, Page found Mother would be able to find work in the retail industry. He further opined:

> With Ms. Gandy's current education with a degree in Business Economics, she would also be able to enter entry-level employment in business and financial occupations. A sample of such jobs might include fundraiser, claims adjuster, market researcher and credit analyst.
>
> Additionally, it was indicated to me by Ms. Gandy that she is considering returning to school to get a registered nursing degree. She revealed her research identifies a minimum of three years to complete. If completed, Ms. Gandy would have an additional option as a registered nurse.

Page reported Mother could immediately qualify for the median wage in retail sales but she would likely start off between the tenth to twenty-fifth percentile range for other business and financial positions. He stated, "In my opinion, given Ms. Gandy's education, work experience and communication skills, she can currently earn a range of wages between . . . $11.28 to $22.62 per hour [for the New Orleans metro area]," which is approximately between $23,000 and $47,000 per year. Regarding pursuing a career in nursing, Page indicated Mother required "an additional three years of full-time course work" and that upon earning her nursing degree, Mother would likely earn approximately $29.11 per hour in the New Orleans metro area, which is around $60,500 annually.

However, Mother testified that in the time between her interview with Page and the trial, the children's hospital in New Orleans offered her a job. Mother explained she spoke with various employees at the children's hospital regarding the possibility of pursuing a nursing degree. Through those discussions and after reviewing Mother's resume, the hospital offered her a job in its fundraising and development department. Therefore, it was no longer her plan to start a nursing program. Mother further testified that if the court permitted her to relocate with the children to New Orleans, she would accept the job, which paid an annual salary of $60,000 with full benefits, including health, vision, and dental insurance for herself and the children. Mother testified that before staying home with the children, she made around $30,000 per year at her job with the marketing firm and approximately $15 an hour part time at the stationery store.

Mother also testified her parents purchased a house, which is located behind their home in New Orleans, for her to live in with the children. Mother would be responsible for utilities but would not have to pay rent. Mother testified the house was also conveniently located because it is only five minutes away from the children's hospital.

Mother's financial declaration indicated a total need of $11,054 per month in child support and alimony from Father. However, Mother acknowledged her declaration *did not account for her anticipated salary; rather, it accounted for no income.* Mother stated she felt her assessed need was reasonable based upon the lifestyle to which she and the children were accustomed to living. For alimony purposes, Father's stipulated monthly income was $12,008.67.

In her pleadings, Mother requested permanent alimony. In its initial final order and decree of divorce, the family court awarded Mother non-modifiable rehabilitative alimony of $2,000 per month for a period of eight years.[3] Father subsequently filed a Rule 59(e), SCRCP, motion requesting a reduction to the amount and time period, asserting the family court failed to specify its reasoning in making its rehabilitative determination. The family court held a hearing on the parties' post-trial motions. During the hearing, the family court stated:

> The Court did have an opportunity to go back and consider . . . the issue of alimony. And in reconsidering that, the Court did look over the totality of the case, the fact that mother had custody of the children, as well as the factors the Court should consider. And while I do find that the order is appropriate for rehabilitative alimony, I find that the eight years was to[o] long and I'm going to reduce that to seven years.

Thereafter, the family court issued an amended final order and decree of divorce, awarding Mother alimony of $2,000 per month for seven years.

Father contends the record contains "scant evidence" supporting the family court's finding that Mother should receive rehabilitative alimony for seven years. In conducting a de novo review of the record, we agree. Our precedent is clear that

---

[3] The family court also awarded Mother $5,000 a month in child support to be secured by Father's life insurance.

the purpose of rehabilitative alimony is to encourage a dependent spouse to become self-supporting.  *See Jenkins*, 345 S.C. at 95, 545 S.E.2d at 535 ("The purpose of rehabilitative alimony is to encourage a dependent spouse to become self-supporting after a divorce.").  Further, an alimony award should balance a spouse's reasonable needs to maintain her standard of living enjoyed during the marriage with her earning capacity.  *See Johnson*, 296 S.C. at 303, 372 S.E.2d at 115 ("While based upon the reasonable needs of the wife to maintain her marital standard of living, the award should also take into account her own earning capacity.").  The family court's award in the present case fails to do so.  We can find no evidence in the record supporting the notion that Mother requires seven years to successfully transition back into the workforce.  To the contrary, Mother successfully obtained employment, in an area in which she has experience, with full benefits and a starting salary that was significantly higher than her vocational expert estimated.  Moreover, Mother's living expenses in New Orleans are drastically reduced as she is only responsible for paying the utilities associated with the home.  Although Mother initially discussed relying on familial support to go back to nursing school full-time for three years, she testified numerous times that she no longer planned to pursue that occupational path after receiving the job offer from the children's hospital.

Based on the foregoing, we reverse the family court's award of rehabilitative alimony to Mother, finding this matter involves the rare instance when the former dependent spouse, Mother, has already become sufficiently self-supporting prior to the end of the case.  Thus, it would be inequitable to require Father to pay rehabilitative alimony.  *See Allen*, 347 S.C. at 184, 554 S.E.2d at 424 ("It is the duty of the family court to make an alimony award that is fit, equitable, and just if the claim is well founded.").[4]

## CONCLUSION

Based on the foregoing, the family court's holdings as to custody and relocation are **AFFIRMED** and the family court's award of rehabilitative alimony to Mother is **REVERSED.**

---

[4] Because our finding as to alimony is dispositive, we decline to address Father's remaining argument as to whether the family court erred in requiring him to secure his alimony obligation with life insurance.  *See Futch v. McAllister Towing of Georgetown, Inc.*, 335 S.C. 598, 613, 518 S.E.2d 591, 598 (1999) (holding an appellate court need not review remaining issues when its determination of a prior issue is dispositive of the appeal).

**HEWITT and VERDIN, JJ., concur.**